PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　*Plaintiff-Appellee,*

v.

RUSSELL LEE EBERSOLE,
　　　　　　*Defendant-Appellant.*

No. 03-4847

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CR-03-112-A)

Argued: October 29, 2004

Decided: June 14, 2005

Before WILKINSON, MICHAEL, and KING, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded by published opinion. Judge King wrote the opinion, in which Judge Wilkinson joined. Judge Michael wrote a separate opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** Gregory Edward Stambaugh, Manassas, Virginia, for Appellant. Thomas Higgins McQuillan, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney, Robert C. Erickson, Assistant United States Attorney, Alexandria, Virginia, for Appellee.

**OPINION**

KING, Circuit Judge:

Russell Lee Ebersole appeals his convictions and sentence on twenty-five counts of wire fraud, in violation of 18 U.S.C. § 1343, and two counts of presenting false claims to the government, in contravention of 18 U.S.C. § 287. The district court sentenced Ebersole to seventy-eight months of imprisonment. Ebersole maintains, among various appellate contentions, that venue was defective in the Eastern District of Virginia, and that the court erroneously enhanced his sentence under the Sentencing Guidelines. As explained below, we affirm Ebersole's convictions on all counts. However, we vacate his sentence, which was imposed in violation of the Sixth Amendment and otherwise improperly enhanced for abuse of a position of trust, and we remand for resentencing in light of *United States v. Booker*, 125 S. Ct. 738 (2005), and its progeny.

I.

Ebersole was the president and director of a business called Detector Dogs Against Drugs and Explosives, Inc. ("Detector Dogs"), a privately held Maryland corporation. Detector Dogs trained dogs and their human handlers to find drugs and explosives, and then offered the services of the canine teams to customers. Ebersole operated Detector Dogs alongside a pet boarding and training facility in Frederick County, Virginia, in the Western District of Virginia, as well as from his home in Hagerstown, Maryland.

In the aftermath of the September 11, 2001 terrorist attacks, federal agencies urgently sought the services of qualified explosive ordnance detection canine teams (sometimes referred to as "EOD canine teams" or "bomb-sniffing canine teams") for the protection of their employees and the public. Among those agencies were the Department of State (the "State Department"), through its primary contractor, Intercon Security Services, Inc. ("Intercon"), for the State Department's Harry S Truman Building in Washington, D.C.; the Board of Governors of the Federal Reserve System (the "BOG-FED"), also for buildings in Washington; and the Internal Revenue Service (the "IRS"), through its primary contractor, Worldwide Security Services, Inc.

("Worldwide"), for the IRS service center in Fresno, California. Ebersole sought to persuade those agencies to retain Detector Dogs's services based on a series of material misrepresentations that he made in written proposals and in fabricated examination, certification, and training curriculum documents. The dogs on the Detector Dogs canine teams actually were poorly trained, and their human handlers lacked adequate knowledge and experience, all in contravention of government standards and requirements.[1] Detector Dogs initiated its services for the State Department on September 24, 2001. Eventually doubting the competence of the Detector Dogs canine teams, the State Department arranged to have an odor recognition proficiency test administered to six of the dogs assigned to protect the Harry S Truman Building. The test had been developed earlier by the Bureau of Alcohol, Tobacco and Firearms (the "BATF") to determine by a standardized method whether a dog could successfully detect the odor of explosives. The test was given on April 22, 2002, at the BATF Canine

---

[1]For example, a former Detector Dogs employee testified that, in March 2002, she had assisted Ebersole in creating test results and certifications (dated as far back as 1997) for dogs designated for the IRS assignment, and that Ebersole had embellished the resumes of their handlers, adding false information such as that one handler had "[a]ssisted the Secret Service on security missions for the [P]resident of the United States and foreign dignitaries." Another former Detector Dogs employee testified that she was a 19-year-old kennel hand when Ebersole directed her to serve as a handler at the BOG-FED facilities; she stated that, "if a dog would have hit on something, I never knew who to call, what to do, what I was supposed to do exactly." The trial evidence also showed that Ebersole utilized forged certificates proclaiming him to be a certified instructor of handlers of bomb-sniffing dogs, and a document purporting to set forth Detector Dogs's training curriculum (a program running 303.5 hours in length). However, handlers testified that they trained for no more than a fraction of that time before being posted with the federal agencies, which had been told by Ebersole in written proposals that the handlers were seasoned canine team veterans with more than twenty years of experience. Witnesses also contradicted other claims made in the written proposals, including that several Detector Dogs's employees were nationally certified trainers and judges with the United States Police Canine Association and the North American Police Work Dog Association, and that Virginia's Department of Criminal Justice Services had approved Detector Dogs's training procedures and certified its handlers.

Enforcement Training Academy in Front Royal, Virginia, to the dogs on the State Department job, all of which failed the test (with their Detector Dogs handlers participating). Immediately thereafter, Intercon terminated its subcontract with Detector Dogs for the provision of EOD canine teams to the State Department.

Detector Dogs was paid more than $212,000 for services it rendered to the State Department during the period of the Intercon subcontract. Detector Dogs had submitted its invoices to Intercon in the District of Columbia. Intercon then reviewed and approved those invoices for payment, paid Detector Dogs by check, and submitted Intercon invoices (with the Detector Dogs invoices attached) to a State Department office in Washington, D.C. Consistent with State Department procedures, the Washington office initially approved the Intercon invoices, and then forwarded them for final payment authorization to a State Department office in Rosslyn, Arlington County, Virginia, in the Eastern District of Virginia. Upon final approval of the Intercon invoices, the State Department's Rosslyn office communicated by wire with a Treasury Department office in Kansas City, Missouri, which paid Intercon.

Detector Dogs began providing services at BOG-FED buildings in Washington, D.C., on October 9, 2001. In a covert on-site test performed on April 4, 2002, three of the Detector Dogs dogs failed to detect the presence of fifty pounds of trenchrite 5 dynamite, fifty pounds of TNT, and fifteen pounds of the plastic explosive C-4 contained in three separate unmarked vehicles that were allowed to enter a BOG-FED parking garage. Based on those test results, the BOG-FED cancelled its contract with Detector Dogs on April 30, 2002.

The BOG-FED paid Detector Dogs approximately $392,000 for its services. Once the BOG-FED had decided to pay a particular Detector Dogs invoice, relevant data was entered into a computerized accounting system in Washington and then transmitted to the Federal Reserve Bank in Richmond, Virginia, in the Eastern District of Virginia, where the BOG-FED maintained an account. The amount of the Detector Dogs invoice was thereafter: (1) debited from the BOG-FED account at the Federal Reserve Bank; (2) credited to the Bank of America's reserve account, also at the Federal Reserve Bank; and (3) credited by the Bank of America from its reserve account to an

account held by Detector Dogs at a Bank of America branch office in Frederick, Maryland.

As for the services provided by Detector Dogs to the IRS, Worldwide informed Detector Dogs that its bomb-sniffing canine teams would be subjected to on-site operational testing at the inception of the job. The Detector Dogs teams began work at the IRS Fresno service center in early 2002, and they subsequently failed tests involving odor detection of hidden explosives on March 19, 25, and 26, and April 29, 2002. On May 16, 2002, Worldwide terminated its subcontract with Detector Dogs for the IRS-Fresno work. Detector Dogs received approximately $92,000 for its services to the IRS. Worldwide had paid Detector Dogs by wire transfer from its bank in Chicago, Illinois, to the reserve account that Detector Dogs's bank, the Bank of America, maintained at the Federal Reserve Bank of Richmond. Those payments then were credited by the Bank of America to Detector Dogs's account at the bank's Frederick, Maryland branch office.

Ebersole also pursued a contract for Detector Dogs to provide bomb-sniffing canine teams to the Federal Emergency Management Agency ("FEMA") for its disaster field office in New York City. On September 27, 2001, Ebersole dispatched a dog-and-handler team to New York City for FEMA; however, the team returned to Maryland the next day without performing any work. FEMA had agreed to reimburse Detector Dogs for travel expenses. Although the handler submitted expenses to Ebersole of $1,100 for the overnight trip, Ebersole submitted an invoice to FEMA in the sum of $11,514.

As instructed by FEMA, Ebersole sent that invoice to a post office box in Berryville, Clarke County, Virginia, in the Western District of Virginia. In the normal course of business, a FEMA employee retrieved mail sent to that post office box, including the Detector Dogs invoice, and transported it to a central mail processing facility located in neighboring Loudoun County, Virginia, in the Eastern District of Virginia. The invoice then was routed to the appropriate person in FEMA's Disaster Finance Division, at an office in Berryville. The central mail processing facility and the Disaster Finance Division office are located within FEMA's sprawling facilities on Mount Weather, which straddles Clarke and Loudoun counties. The Detector

Dogs invoice was eventually forwarded from Mount Weather to a FEMA contracting officer in New York. FEMA subsequently remitted payment to Detector Dogs in the requested sum of $11,514.

In all, the federal agencies paid Ebersole more than $708,000 for bomb-sniffing canine team services. On the basis of these activities and the payments made to Ebersole, and as explained below, the Government instigated and prosecuted the underlying proceedings.

## II.

## A.

A grand jury in the Eastern District of Virginia returned an indictment against Ebersole on March 13, 2003, charging him with twenty-six counts of wire fraud and two counts of presenting false claims to the government.[2] The indictment generally alleged that Ebersole had devised a scheme to obtain money from the federal agencies by inducing them — by means of false and fraudulent pretenses, representations, and promises — to use Detector Dogs's services.

---

[2]The wire fraud statute provides for criminal penalties, including fines and imprisonment, against

> [w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

18 U.S.C. § 1343. The false claims statute provides for such penalties against

> [w]hoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent.

18 U.S.C. § 287.

The wire fraud and false claims statutes do not include explicit venue provisions. To support venue on the wire fraud charges in the Eastern District of Virginia, the prosecution relied on the following wire communications (all involved in paying for those services): (1) from the State Department in Rosslyn, Arlington County, to the Treasury Department in Kansas City, Missouri, for the fourteen State Department-related counts;[3] (2) from the BOG-FED in Washington, D.C., to the Federal Reserve Bank in Richmond, for the ten BOG-FED-related counts;[4] and (3) from Worldwide's bank in Chicago, Illinois, to the Bank of America reserve account in Richmond, for the single IRS-related count.[5] Finally, to support venue on the two false claims charges, the prosecution pointed to the following: the handling of Ebersole's invoice at FEMA's Mount Weather mail processing center in Loudoun County, for the FEMA-related count;[6] and the processing of an Intercon invoice (with a Detector Dogs invoice attached) by the State Department in Rosslyn, for the State Department-related count.[7]

Ebersole unsuccessfully challenged the propriety of venue at various points in the district court proceedings.[8] Ebersole's trial began on June 9, 2003. On June 20, 2003, the jury returned a verdict of guilty

---

[3]Counts 5, 7-8, 11-13, 15, 17, 19-20, and 23-26.

[4]Counts 1, 3-4, 6, 9-10, 14, 16, 18, and 21.

[5]Count 22. A single FEMA-related wire fraud count — count 2 — was dismissed at trial on motion of the prosecution.

[6]Count 27.

[7]Count 28.

[8]Specifically, Ebersole challenged venue: in his April 7, 2003 pretrial motion seeking dismissal of the indictment; during the May 2, 2003 hearing conducted in the district court on that pretrial motion; in his June 16, 2003 motion, made during the trial at the close of the prosecution's case-in-chief, for judgment of acquittal on the FEMA-related false claim count, with accompanying general "continuing objections" to venue on all other charges; in his June 17, 2003 written objection to the prosecution's proposed venue instruction on the false claims charges; during the June 18, 2003 charge conference conducted in the district court; in his June 30, 2003 post-trial motion for judgment of acquittal on all counts; and during the September 8, 2003 hearing conducted in the district court on that post-trial motion.

on each of the twenty-seven counts before it. Significantly, the jury had been instructed that it was required to find proper venue in order to convict Ebersole on a given count. On appeal, Ebersole continues to maintain that none of the charges against him were susceptible to trial in the Eastern District of Virginia.

B.

As a general proposition, venue is proper in any district where the subject crime was committed. *United States v. Wilson*, 262 F.3d 305, 320 (4th Cir. 2001) (citing U.S. Const. art. III, § 2, cl. 3; Fed. R. Crim. P. 18). If Congress does not explicitly provide for venue when it enacts a criminal statute, venue is to "'be determined from the nature of the crime alleged and the location of the act or acts constituting it.'" *United States v. Cabrales*, 524 U.S. 1, 6-7 (1998) (quoting *United States v. Anderson*, 328 U.S. 699, 703 (1946)). This assessment must focus on the "essential conduct elements" of the charged offense. *United States v. Bowens*, 224 F.3d 302, 311 (4th Cir. 2000) (holding "that the place where a criminal offense is committed is determined solely by the essential conduct elements of that offense"). The venue determination also is guided by the general venue provisions for federal criminal offenses, set forth in 18 U.S.C. §§ 3231-3244.

The prosecution bears the burden of proving venue by a preponderance of the evidence and, when a defendant is charged with multiple crimes, venue must be proper on each count. *Bowens*, 224 F.3d at 308. For some offenses, there may be "more than one appropriate venue, or even a venue in which the defendant has never set foot." *Id.* at 309 (citations omitted).

The Supreme Court has cautioned that the question of venue in a criminal case is more than a matter "of formal legal procedure"; rather, it raises "deep issues of public policy in the light of which legislation must be construed." *United States v. Johnson*, 323 U.S. 273, 276 (1944). The Court also has observed that the venue provisions of the Constitution are meant to act as safeguards, protecting the defendant from bias, disadvantage, and inconvenience in the adjudication of the charges against him. *Travis v. United States*, 364 U.S. 631, 634 (1961) (citing U.S. Const. Art. III, § 2 (pertaining to venue)); U.S.

Const. amend. VI (pertaining to jury trials)). Despite its constitutional dimension, however, proper venue may be waived by the defendant. *See United States v. Collins*, 372 F.3d 629, 633 (4th Cir. 2004); *United States v. Melia*, 741 F.2d 70, 71 (4th Cir. 1984). With these principles in mind, we address Ebersole's venue contentions in turn.

1.

With regard to the twenty-five wire fraud counts, Ebersole first contends that the district court erred in treating wire fraud as a "continuing offense," triable under 18 U.S.C. § 3237(a) "in any district in which such offense was begun, continued or completed" — including any district in which a subject wire communication was transmitted in the course of paying the perpetrator of the fraud scheme.[9] Alternatively, Ebersole asserts that, even conceding that wire fraud constitutes such a continuing offense, venue on the wire fraud counts was not constitutionally permissible because he did not intend or foresee the payment-related transmittals into and out of the Eastern District of Virginia on which the prosecution relies. For the following reasons, we decline to vacate Ebersole's wire fraud convictions on either of those grounds.

a.

Ebersole initially pressed his theory that wire fraud does not constitute a "continuing offense," for purposes of establishing venue under § 3237(a), in his April 7, 2003 pretrial motion seeking dismissal of the indictment. That motion was denied following the May 2, 2003 hearing conducted in the district court. Ebersole had maintained (and presently contends) that his wire fraud offenses were complete once he induced the federal agencies to use Detector Dogs's services, thus precipitating the subsequent wire communications. According to Ebersole, because the wire communications themselves had occurred later, and because payment is not an essential element of wire fraud,

---

[9]The venue provision at issue here, contained in § 3237(a) of Title 18, states, in relevant part, that "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."

the payment-related wire communications could not establish venue at their transmission points.

In rejecting Ebersole's contention, the district court reasoned that, where the purpose of a wire fraud scheme is to obtain money, the crime is not complete until the perpetrator has been paid. Accordingly, the court held that venue would be appropriate under § 3237(a) in any district where wire communications had been transmitted in paying the perpetrator, particularly if those transmittals occurred in the normal course of the victim's business. Applying those principles to Ebersole's case, the court refused to dismiss the wire fraud counts for defective venue, because the indictment alleged that he had sought money from the federal agencies "for services that were not what they purported to be." The agencies had indeed paid Ebersole, and, as a result, wire communications had been transmitted into and out of the Eastern District of Virginia as part of the "natural sequence" of making payment.

During Ebersole's trial, on June 18, 2003, the court instructed the jury that venue was proper on the wire fraud counts "if any act in furtherance of the wire fraud allegations occurred in the Eastern District of Virginia," including Rosslyn, in Arlington County, and the City of Richmond. The court explained that

> [a]n offense is not complete until it's complete, and the offense of making — of a scheme to defraud is not complete until there has been a victim, and in this case, the allegation is that the government agencies were victimized, because they let these contracts, they made the payments, they handled the various invoices and documents, and within the course of that processing, the wires were used.

Ebersole did not object to this instruction, despite being afforded several opportunities to do so. However, Ebersole did challenge venue on the wire fraud counts in: his pretrial motion seeking dismissal of the indictment; his general "continuing objections" to venue, noted during the trial on June 16, 2003, at the close of the prosecution's case-in-chief; and his post-trial motion for judgment of acquittal.

Because the venue question was submitted to the jury,[10] Ebersole's appellate contention is properly framed as an assertion that the court's venue instruction on the wire fraud counts was flawed as a matter of law. Normally, Ebersole's failure to specifically object to that instruction during the trial would constrain us to review its substance for plain error only. *See* Fed. R. Crim. P. 30(d).[11] However, a claim of instructional error may alternatively be preserved by an objection in a directed verdict motion made pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure, before the jury retires. *See Jones v. United States*, 527 U.S. 373, 388 (1999) (citing *Leary v. United States*, 395 U.S. 6, 32 (1969)).[12] On June 16, 2003, at the same time that Ebersole moved at the close of the prosecution's case-in-chief for judgment of acquittal on the FEMA-related false claim count, he also noted his "continuing objections over the venue for the rest of the charges." In these circumstances, Ebersole's "continuing objections" can fairly be characterized as motions under Rule 29(a) for judgment of acquittal on each of the wire fraud counts, on the same grounds that Ebersole had articulated in his pretrial motion seeking dismissal of the indictment.

Ebersole therefore preserved his particularized claim of error — *i.e.*, that wire fraud does not constitute a "continuing offense" under

_____

[10]Submitting the venue question to the jury is an appropriate procedure for resolving a factual dispute relating to venue. *Cf. United States v. Martinez*, 901 F.2d 374, 376 (4th Cir. 1990) (observing that "proof of venue may be so clear that failure to instruct [the jury] on the issue is not reversible error").

[11]Under Rule 30(d) of the Federal Rules of Criminal Procedure, "[a] party who objects to any portion of the instructions . . . must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Rule 30(d) further provides that, in the absence of such an objection, the instruction cannot be reviewed on appeal, "except as permitted under Rule 52(b)." Rule 52(b) provides, in turn, that "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention."

[12]Rule 29(a) of the Federal Rules of Civil Procedure provides that, "[a]fter the government closes its evidence . . . , the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."

§ 3237(a) — with regard to the court's venue instruction on the wire fraud counts. Accordingly, we review the content of that instruction for abuse of discretion. *See United States v. Higgs*, 353 F.3d 281, 309 (4th Cir. 2003). By definition, a court "abuses its discretion when it makes an error of law." *United States v. Prince-Oyibo*, 320 F.3d 494, 497 (4th Cir. 2003) (internal quotation marks omitted).

Contrary to Ebersole's "continuing offense" contention, the venue instruction on the wire fraud counts did not constitute legal error, and, thus, the court did not abuse its discretion. That is, the court correctly identified wire fraud as a "continuing offense," as defined in § 3237(a), properly tried in any district where a payment-related wire communication was transmitted in furtherance of Ebersole's fraud scheme. *See United States v. Kim*, 246 F.3d 186, 192 (2d Cir. 2001), *cited with approval in United States v. Stewart*, 256 F.3d 231, 243 (4th Cir. 2001). Indeed, Ebersole as much as concedes that wire fraud was properly considered a continuing offense for venue purposes under our *Stewart* decision. In his appellate brief, Ebersole observes that "[t]he *Kim* court held, and this court has also held [in *Stewart*], that wire fraud is a 'continuing offense' under 18 U.S.C. § 3237." We actually held in *Stewart* that, under the facts presented, money laundering (not wire fraud) constituted a continuing offense within the meaning of § 3237(a). 256 F.3d at 242-44. Nonetheless, in so concluding, we relied on the Seventh Circuit's determination in *Kim* "that venue was proper for a substantive wire fraud conviction as a continuing offense when the defendant, although not the actual sender or receiver of wire transmissions, caused communications to be transmitted into and out of the district in which the defendant was tried." *Id.* at 243 (citing *Kim*, 246 F.3d at 192) (internal quotation marks omitted).

Here, the nature of the offense alleged was "the act of causing a wire to be transmitted in furtherance of a fraud." *Kim*, 246 F.3d at 191. Wire communications used in making payment from the federal agencies to Ebersole — *i.e.*, those that "caused the fraud to bear fruit" — were certainly "essential to the continuing offense of causing fraudulent wires to be transmitted." *Id.* at 193. Each of those transmittals occurred "both where it was sent and where it was received." *Id.* at 191; *see also United States v. Donato*, 866 F. Supp. 288, 292 (W.D. Va. 1994). Venue was therefore proper on the wire fraud charges

against Ebersole if, as the district court instructed and the jury found, he caused any payment-related wire communication to be transmitted to or from the Eastern District of Virginia. *See Kim*, 246 F.3d at 192-93 (holding venue proper on wire fraud charges in Southern District of New York because payment-related wire communications were transmitted to and from Manhattan bank); *United States v. Goldberg*, 830 F.2d 459, 465 (3d Cir. 1987) (recognizing that offenses were triable in Eastern District of Pennsylvania because "wire transfer of funds from New York to Wilmington . . . passed through the Federal Reserve Bank in Philadelphia"). Accordingly, we reject Ebersole's "continuing offense" contention and approve the venue instruction given by the court.

b.

Alternatively, Ebersole asserts that, even if wire fraud constitutes a continuing offense for venue purposes, venue on the wire fraud counts against him was not constitutionally permissible because he did not intend or foresee that his scheme would cause the transmittals into and out of the Eastern District of Virginia. Ebersole relies for that contention on a decision of the Southern District of New York. *See United States v. Bezmalinovic*, 962 F. Supp. 435, 441 (S.D.N.Y. 1997) (concluding that bank's ministerial acts of debiting and crediting accounts were insufficient to support venue on fraud charge, because it was unintended and unforeseeable by defendant that such acts would occur there); *see also United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003) (recognizing that venue is proper in district where defendant intentionally or knowingly causes act in furtherance of charged offense to occur, or in district where it was foreseeable such act would occur).

Unfortunately for Ebersole, he did not raise his "foreseeability" objection to venue in a timely manner. That objection was first asserted in the district court after Ebersole had already been convicted by the jury, during the September 8, 2003 post-trial hearing on his motion seeking judgment of acquittal. Meanwhile, any venue defect based on a lack of foreseeability was apparent on the face of the indictment. That is, without alleging that any other relevant conduct occurred there, the indictment specified that wire communications in furtherance of Ebersole's fraud scheme were transmitted to and from

the Eastern District of Virginia, plainly indicating that the prosecution was relying on those transmittals to establish venue.

Because every fact giving rise to Ebersole's present foreseeability objection to venue clearly appeared on the face of the indictment, Ebersole waived that objection by waiting until the post-trial proceeding to raise it. *See Collins*, 372 F.3d at 633 (recognizing that if "the asserted venue defect 'is apparent on the face of the indictment' a defendant . . . waive[s] any objection if he fails to object prior to trial") (quoting *Melia*, 741 F.2d at 71). Accordingly, without reaching the merits of Ebersole's foreseeability objection, we affirm Ebersole's convictions on the twenty-five wire fraud counts.

2.

With regard to the two false claims counts, Ebersole maintains that the district court erroneously ruled that those offenses were susceptible to trial in any district into which the victimized federal agency passed the subject claim, in the normal course of its business, following the claim's initial presentation to that agency. As explained below, we affirm Ebersole's convictions on the false claims counts.

a.

It is helpful to begin with a survey of the parties' respective positions on proper venue for the false claims charges. Ebersole and the prosecution agree that venue on those counts is controlled by our decision in *United States v. Blecker*, 657 F.2d 629 (4th Cir. 1981). However, the parties espouse competing views as to the reach of the *Blecker* decision.

In *Blecker*, the defendant-subcontractors had prepared false claims in Maryland and then submitted them to a contractor at its office in Rosslyn, Virginia, knowing that the contractor would in turn present those claims to a government office in Washington, D.C. 657 F.2d at 631. We recognized that the presentation of false claims to the government constitutes a continuing offense under 18 U.S.C. § 3237(a), and we concluded that venue was proper on the facts presented in either: (1) the district where the claims were prepared (the District of

Maryland); (2) the district where the claims were presented to, or "ultimately came to rest with," the government (the District of Columbia); or (3) under a "pass through" theory, the district where the claims were submitted to the intermediary-contractor by the defendants, knowing that the intermediary would then present the claims to the government (the Eastern District of Virginia). *Id.* at 632-33 (citing *United States v. Candella*, 487 F.2d 1223, 1227-28 (2d Cir. 1973)) (other citations omitted); *see also United States v. Barsanti*, 943 F.2d 428, 434-35 (4th Cir. 1991) (applying *Blecker* "pass through" rationale in assessing proper venue on charges of presenting false statements to the government, in violation of 18 U.S.C. § 1001).

Ebersole maintains on appeal that our *Blecker* decision stands for the principle that false claims charges are triable *exclusively* in those districts in which: (1) the defendant prepared the claim; (2) the claim was initially presented to the government by the defendant or an intermediary; or (3) the claim was submitted to an intermediary by the defendant, who possessed knowledge that the intermediary would then present it to the government. Under Ebersole's view, venue would have been proper on the State Department-related count in the District of Columbia (where both Ebersole submitted that claim to Intercon, and Intercon in turn presented it to the State Department), and on the FEMA-related count in the Western District of Virginia (where Ebersole initially presented that claim to FEMA, at its Berryville post office box).[13] Ebersole insists that, under *Blecker*, venue was defective in the Eastern District of Virginia on each of the false claim charges, because those claims passed through that district only after they had already been presented to the respective federal agencies and, thus, his offenses had already been completed.

By contrast, the prosecution endorses a more expansive interpretation of *Blecker*. The prosecution relies on our statement in *Blecker* that venue would be proper on a false claim charge in the district where the subject claim "ultimately came to rest" with the victimized federal agency. *See Blecker*, 657 F.2d at 632. The prosecution main-

---

[13]Ebersole also acknowledges that venue would have been appropriate on each of the false claims counts in the district where he prepared the subject claim, which he identifies as either the Western District of Virginia or the District of Maryland.

tains that, in view of that language, a false claim charge is potentially triable in more districts than those allowed by Ebersole. Such districts include any district where the agency (a) ultimately authorized payment of the claim following its initial presentation, or (b) processed the claim between its initial presentation and the final payment authorization. As further support for its position, the prosecution points to the Second Circuit's *Candella* decision, which we relied on in *Blecker*, and which concluded that venue was proper on a false statement charge in the Southern District of New York as the place where "the decision was reached to make the funds available," even though the false statement at issue had initially been presented to the government elsewhere. *See Candella*, 487 F.2d at 1228. Under the prosecution's view, venue was proper in the Eastern District of Virginia on the false claims charges against Ebersole because (a) the State Department authorized payment in Rosslyn, Arlington County, of one claim following its initial presentation in the District of Columbia, and (b) FEMA processed the other claim on Mount Weather, in Loudoun County, between the claim's initial presentation in the Western District of Virginia and the final payment authorization in New York.

b.

The prosecution has urged its broad interpretation of *Blecker* since at least April 14, 2003, when it filed its response to Ebersole's pretrial motion seeking dismissal of the indictment. Ebersole challenged the prosecution's reliance on *Blecker* on various legal and factual grounds during the pretrial proceedings. Unpersuaded, the district court denied Ebersole's pretrial motion following the May 2, 2003 hearing.

During the trial, on June 16, 2003, Ebersole made his motion for judgment of acquittal on the FEMA-related count, pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure. After the court denied his Rule 29(a) motion, Ebersole raised his "continuing objections over the venue for the rest of the charges," presumably including the State Department-related false claim count. The following day, June 17, 2003, Ebersole filed a short written objection to the prosecution's proposed venue instruction on the false claims charges, which had been submitted to the court prior to the trial. The instruction explained that venue was proper on those counts if "any act in further-ance of the crime . . . occurred within the Eastern District of Vir-

ginia," including Loudoun County and Rosslyn, in Arlington County. The instruction also stated that

> it is sufficient for venue purposes if the claim that allegedly was false passed through the Eastern District of Virginia before coming to the final office where it was paid. It is equally sufficient for venue purposes if the claim that allegedly was false was submitted initially to a department or agency located in another judicial district, an[d] then, in the normal course of business, was sent to an office within the Eastern District of Virginia for payment.

During the charge conference conducted by the district court on June 18, 2003, the court overruled Ebersole's objection to the prosecution's venue instruction and incorporated it into the charge delivered to the jury later that same day.

The views espoused by Ebersole before and during trial were not nearly as thorough and clear as his much more particularized and coherent post-trial contentions with regard to the scope of proper venue under *Blecker*. Nonetheless, Ebersole's Rule 29(a) motion and objection to the prosecution's venue instruction, along with his pre-trial motion and "continuing objections" to venue at the Rule 29 motion stage, were sufficient to preserve his appellate challenge to the substance of the instruction. *See* Fed. R. Crim. P. 30(d) (requiring party who objects to instruction to timely inform court of specific objection and grounds for objection); *see also Jones*, 527 U.S. at 388 (recognizing claim of instructional error may be preserved by objection in Rule 29(a) motion (citing *Leary*, 395 U.S. at 32)). In particular, Ebersole contended in his Rule 29(a) motion (as he does on appeal) that his FEMA-related false claim offense was complete once he mailed the subject invoice to FEMA's post office box in Berryville, and that "the mere fact that the government then has a distribution system that brings it into the Eastern District is insufficient to confer venue." That contention extends to the State Department-related count, which offense Ebersole asserts was complete once Intercon presented his claim to the State Department in Washington, D.C.

Therefore, we review the substance of the venue instruction on the false claims counts for abuse of discretion. *See Higgs*, 353 F.3d at

309. And we recognize, once again, that a court "abuses its discretion when it makes an error of law." *Prince-Oyibo*, 320 F.3d at 497 (internal quotation marks omitted).

c.

Ebersole's appellate contention causes us to consider an issue of first impression: whether, as Ebersole's jury was instructed, venue on a false claim charge may be proper in a district into which the victimized government agency had passed the subject claim after its initial presentation to that agency (either by the defendant or an intermediary). For the reasons that follow, we conclude that the court's venue instruction correctly stated the law and, thus, did not constitute an abuse of discretion.

We look, of course, to *Blecker*. The parties' competing interpretations of *Blecker* (including its reference to proper venue in the district where a false claim "ultimately came to rest" with the government) are possible because that case did not involve an agency internally passing a false claim from district to district after its initial presentation directly to that agency. *See* 657 F.2d at 632. Rather, *Blecker* focused on an issue that is factually distinct from that before us here: whether venue was proper in the district where the defendants submitted false claims to an intermediary, knowing that the intermediary would in turn present the claims to the government. *See id.* at 631-33 (concluding that venue was proper in such circumstances under a "passing through" theory). Nonetheless, *Blecker* provides us with ample guidance.

First of all, it was determined in *Blecker* that a violation of the false claims statute may be treated as a "continuing offense" under 18 U.S.C. § 3237(a) for purposes of establishing venue in more than one district. 657 F.2d at 632. Furthermore, *Blecker* identified the acts constituting a false claim offense as the "mak[ing]" and, more significantly for our present purposes, the "present[ation]" of a false claim to the government. *Id.* (recognizing that false claims statute "provides that any person who 'makes or presents'" false claim to government is guilty of crime, and thus that venue lies to prosecute violator of statute in either "district in which the claims were made or prepared,"

or "one in which they were presented to the government").[14] The issue here is whether, in view of the undisputed facts regarding the movement of Ebersole's false claims, those claims were "presented" to the government in the Eastern District of Virginia.

We already know, as demonstrated in *Blecker*, that a false claim may be "presented" in more than one district. That is, *Blecker* recognized that venue was proper in both the district where false claims were presented to an intermediary, and the district where the intermediary presented the claims to the government. 657 F.2d at 633. Indeed, in *Barsanti*, where the "passing through" theory was extended to false statement offenses under 18 U.S.C. § 1001, the sequential presentations of the false claims in *Blecker* were described as the basis for that theory. *See Barsanti*, 943 F.2d at 434 (citing *Blecker*, 657 F.2d at 632-33).

While the facts of *Blecker* are different than those presented here, the distinctions are without legal consequence. In *Blecker*, the false claims at issue were "presented" twice, thus establishing venue in two different districts based on the locations of the presentations of the claims. It necessarily follows, therefore, that Ebersole's false claims could be "presented" multiple times. As nothing in *Blecker* compels a contrary conclusion, it is of no significance that the false claims there were presented directly to the targeted federal agency just once (by the intermediary), and that Ebersole's false claims were presented directly to the agencies multiple times (as they passed the claims internally in the course of processing them for payment).

We are persuaded to this conclusion by the Second Circuit's decision in *Candella*, in which we found support in *Blecker* for our "passing through" theory. *See Blecker*, 657 F.2d at 633. We observed in *Blecker* that, "[p]resented with a similar factual situation, the Second Circuit has implied that venue is proper in either the district in which the false claim is submitted to the intermediary or the district in which the intermediary transmits the false claim to the agency." *Id.* (citing *Candella*, 487 F.2d at 1227-28).

---

[14]That is, the making and the presentation of a false claim are the "essential conduct elements" of the false claim offense. *See Bowens*, 224 F.3d at 311.

The *Candella* defendants, who owned a moving company, were prosecuted in the Southern District of New York for filing false statements within the jurisdiction of the United States Department of Housing and Urban Development ("HUD"), in contravention of 18 U.S.C. § 1001. 487 F.2d at 1224-25. The defendants sought reimbursement from a joint urban renewal project between New York City and HUD, which was administered by the City and wholly funded by the federal government. *Id.* at 1226. The defendants' false statements had been "prepared, executed and handed to New York City officials in Brooklyn," in the Eastern District of New York. *Id.* at 1227. Those statements then had been variously conveyed for examination and payment authorization to City and HUD offices in Manhattan, in the Southern District of New York. *Id.*

The defendants contended that they should have been prosecuted in the Eastern District of New York, instead of the Southern District. *Candella*, 487 F.2d at 1227. The Second Circuit concluded, however, that venue was proper in each of those districts, invoking 18 U.S.C. § 3237(a) (establishing venue on continuing offenses). *Id.* at 1228 ("Although enough was done in the Eastern District to constitute a crime there . . . , it does not follow that the crime then terminated, and that what transpired in Manhattan was irrelevant for venue purposes." (internal citations omitted)). The court observed "that venue is properly laid in 'the whole area through which force propelled by an offender operates.'" *Id.* (quoting *Johnson*, 323 U.S. at 275). And the court reasoned that

> [t]he force propelled here by the defendants immediately contemplated Manhattan. 18 U.S.C. § 1001 defines the offense as the making of a false or fraudulent statement or representation in a matter within the jurisdiction of a federal agency. The false statements here were intended to produce funds. The statements continued to be false and continued to be within the jurisdiction of the United States not only when initially presented but also upon arrival in Manhattan, where the decision was reached to make the funds available. Venue for all counts thus was properly laid in the Southern District of New York.

*Id.* (internal citation omitted).

Significantly, the venue dispute in *Candella*, which we found to be similar to that presented in *Blecker*, is actually more analogous to this dispute. That is, the *Candella* defendants, like Ebersole, challenged venue in a district into which the victimized federal agency had itself passed the false statement or claim after its initial presentation directly to that agency.[15] One of Ebersole's false claims was initially presented to the State Department by Intercon, as an intermediary, in Washington, D.C. The State Department's Washington office began the processing of the claim, and then forwarded it to the agency's Rosslyn office, in the Eastern District of Virginia, for final payment authorization. Ebersole submitted his other false claim directly to FEMA at its Berryville, Virginia post office, where it was retrieved by FEMA and taken for further action to its nearby mail processing center on Mount Weather in Loudoun County, in the Eastern District of Virginia. FEMA representatives subsequently handled the claim at offices in Berryville and New York in the course of processing it for payment.

In these circumstances, venue was proper on each of the false claims counts in the Eastern District of Virginia, as one of several districts "through which force propelled by [Ebersole] operate[d]" as the claims proceeded through the necessary channels on their way to producing funds. *Candella*, 487 F.2d at 1227 (internal quotation marks omitted). That is, Ebersole's State Department-related claim was "presented" in the Eastern District of Virginia (in addition to the District of Columbia), and his FEMA-related claim was "presented" in the Eastern District of Virginia (as well as the Western District of Virginia and the district encompassing FEMA's office in New York). *See Blecker*, 657 F.2d at 632. Because the district court's venue instruction on the false claims charges adequately reflected these legal principles, the instruction did not constitute an abuse of discretion.

---

[15]Although the *Candella* defendants' false statements were initially presented in the Eastern District of New York to City officials acting on behalf of the federal government, there was no issue that the City was an "intermediary" or that venue in the Eastern District would have been improper (as would render the issues in *Candella* more like those raised in *Blecker*).

Therefore, we affirm Ebersole's convictions on the two false claims counts.[16]

III.

A.

On September 8, 2003, after denying Ebersole's post-trial motion seeking judgment of acquittal, the district court proceeded to sentence him pursuant to the Sentencing Guidelines. In determining Ebersole's sentencing range, the court grouped the twenty-seven wire fraud and false claims counts together. *See* USSG § 3D1.2(d) (2002) (providing for grouping of counts when offense level is determined on basis of aggregate harm). Ebersole's base offense level for the grouped counts was level 6. *Id.* § 2B1.1(a) (establishing base offense level for crimes involving fraud and deceit). The court then applied various enhancements to Ebersole's offense level, including a two-level enhancement for abuse of a position of trust. *Id.* § 3B1.3 (directing court to apply two-level increase "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense").[17]

---

[16]We acknowledge that Ebersole raises on appeal other contentions of trial error, including that: (1) the district court abused its discretion in admitting certain evidence of prior bad acts, and in denying Ebersole's motion for mistrial; (2) the court erred in denying his motion to suppress evidence based on an allegedly improper search warrant; (3) the court abused its discretion in limiting Ebersole's use before the jury of a videotape purporting to show him administering an odor recognition test to his bomb-sniffing dogs; and (4) the prosecution violated Ebersole's rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to timely disclose mistakes made in administering tests to Detector Dogs canine teams. We have carefully considered those contentions and conclude that they are without merit.

[17]The other enhancements included: a 14-level increase for a loss or intended loss of $906,804, USSG § 2B1.1(b)(1)(H) (2002); a two-level increase for an offense involving conscious or reckless risk of death or serious bodily injury, *id.* § 2B1.1(b)(11); and a two-level increase for obstruction of justice, *id.* § 3C1.1.

Ebersole's final adjusted offense level was level 26, and he qualified for a criminal history category of I. Accordingly, the applicable sentencing range was sixty-three to seventy-eight months of imprisonment. The statutory maximum prison term deemed applicable to Ebersole on any one of the wire fraud or false claims counts was sixty months. *See* 18 U.S.C. § 287 (2000); 18 U.S.C. § 1343 (2000). The court imposed consecutive prison terms of eighteen months on one of the BOG-FED-related wire fraud counts and sixty months on the remaining twenty-six counts, for a total prison term of seventy-eight months (the high end of the Sentencing Guidelines range).[18] Without the various enhancements to his offense level — each of which was based upon facts found by the district court, not by the jury — the applicable sentencing range would have been zero to six months of imprisonment.

On April 28, 2004, Ebersole filed his opening appellate brief, in which he contends that the district court erroneously applied the enhancement for abuse of a position of trust, as well as the enhancement for an offense involving conscious or reckless risk of death or serious bodily injury. The Supreme Court subsequently rendered its decision in *Blakely v. Washington*, 124 S. Ct. 2531, 2537-38 (2004) (holding that sentence imposed under Washington State sentencing scheme violated Sixth Amendment because it was enhanced based on judge-found facts). Ebersole thereafter filed a motion to remand this case to the district court for further proceedings or, in the alternative, for leave to file a supplemental brief addressing *Blakely*.

By Order of August 18, 2004, we denied Ebersole's motion to remand; granted his motion to file a supplemental brief, deeming the motion to be the supplemental brief; and denied his *Blakely* claim on its merits in light of our Order of August 2, 2004 in *United States v. Hammoud*, 378 F.3d 426 (4th Cir. 2004) (determining that *Blakely* did not operate to invalidate sentence imposed under federal Sentencing Guidelines), *opinion issued by* 381 F.3d 316, 353-54 (4th Cir. 2004) (en banc). Since then, however, the Supreme Court has applied its reasoning in *Blakely* to the Sentencing Guidelines, *see Booker*, 125 S. Ct. at 746, and has granted certiorari in *Hammoud* and vacated our

---

[18]The court also ordered Ebersole, *inter alia*, to pay restitution of $708,458.78.

judgment therein, *see* 73 U.S.L.W. 3436, 2005 WL 124093 (U.S. Jan. 24, 2005) (No. 04-193).

B.

In reviewing Ebersole's sentence, we first re-examine, in light of *Booker*, his contention that his sentence violated the Sixth Amendment. Next, we consider the propriety of the contested sentencing enhancements. As set forth below, we conclude that Ebersole is entitled to resentencing under *Booker*, and that the enhancement for abuse of a position of trust is improper in the present circumstances.

1.

Ebersole raised the Sixth Amendment challenge to his sentence for the first time on appeal. Therefore, with regard to that contention, we review his sentence for plain error under the familiar *Olano* mandate. *See Olano*, 507 U.S. at 732; *see also United States v. Hughes*, 401 F.3d 540, 547 (4th Cir. 2005). The *Olano* conditions are satisfied here.

First, the district court's imposition of the seventy-eight-month sentence constituted error under *Booker*. *See* 125 S. Ct. at 746 (holding Sixth Amendment contravened when sentencing court, acting pursuant to Guidelines, imposes sentence greater than maximum authorized by facts found by jury alone). Under the then-mandatory Guidelines regime, the jury verdict supported an offense level of 6, resulting in a sentencing range of zero to six months. However, that jumped to an offense level of 26 — carrying a sentencing range of sixty-three to seventy-eight months — because of the application of various enhancements based on facts found solely by the sentencing judge. Thus, as *Booker* has taught us, the court erred in relying on its own fact-finding to impose a sentence of greater than six months. *See Hughes*, 401 F.3d at 547 (recognizing that imposition of sentence, "in part based on facts found by the judge, . . . constituted error").

Second, although Ebersole's Sixth Amendment contention was foreclosed by our precedent at the time of his sentencing, *Booker* has since "abrogated our previously settled law," rendering the error plain.

*Hughes*, 401 F.3d at 547-48. And third, the error was prejudicial, in that Ebersole's seventy-eight-month sentence was greater — by seventy-two months — than the six-month maximum authorized by the facts found by the jury alone. *See id.* at 548-49.

Finally, to affirm Ebersole's sentence despite the error would seriously affect the fairness, integrity, or public reputation of the judicial proceedings. In the wake of *Booker*, as we have recognized, the Guidelines are to be treated as advisory, rather than mandatory, and sentences that fall within the statutorily prescribed range are reviewable only for reasonableness. *Hughes*, 401 F.3d at 546 (citing *Booker*, 125 S. Ct. at 765-68). The record before us does not indicate what sentence the court would have imposed on Ebersole had its exercised its discretion under 18 U.S.C. § 3553(a) and treated the Guidelines as merely advisory; although it is possible that Ebersole will receive the same sentence on remand, "[t]his possibility is not enough to dissuade us from noticing the error." *Id.* at 556. We therefore exercise our discretion to notice the error, vacate Ebersole's sentence, and remand for resentencing consistent with *Booker* and its progeny.

2.

Under the first step of the *Booker* remedial scheme, a court must determine the range prescribed by the Sentencing Guidelines after making any necessary findings of fact. *See Hughes*, 401 F.3d at 556. As a result, the same calculation issues raised in this appeal by Ebersole are likely to arise again upon remand. *See id.* We therefore choose to address Ebersole's contentions that the district court improperly applied two particular enhancements to his sentence under the Guidelines. *Id.* And we express our agreement with the more compelling of those contentions: that the court misapplied the enhancement for abuse of a position of trust, under *United States Sentencing Guidelines Manual* § 3B1.3 (2002).

The § 3B1.3 enhancement had been recommended in Ebersole's presentence report ("PSR") on the following grounds:

> The defendant represented himself to various contract officers as an EOD handler certified by State and federal regulating agencies. Based on his spoken and written assertions

that he occupied a certified position of public trust, he was contracted to provide EOD services for three federal agencies. Mr. Ebersole abused that perceived position of trust to enrich himself.

The court adopted the PSR's recommendation and imposed the enhancement over Ebersole's objection. We review de novo the district court's legal interpretation of what constitutes "a position of trust" under § 3B1.3, and we review its factual findings for clear error. *See Hughes*, 396 F.3d at 382; *see also United States v. Caplinger*, 339 F.3d 226, 235-36 (4th Cir. 2003).

A defendant deserves the two-level increase in his offense level under § 3B1.3 "if the district court 'determines that [he] abused a position of trust and that abuse significantly contributed to the commission or concealment of the crime.'" *Caplinger*, 339 F.3d at 235 (quoting *United States v. Akinkoye*, 185 F.3d 192, 203 (4th Cir. 1999)) (alteration in original). The sometimes difficult inquiry into what constitutes a "position of trust" is guided to some extent by the commentary to § 3B1.3 and, as we have emphasized, "must focus on the relationship between the defendant and the victim from the perspective of the victim." *Id.* at 236 (citing *United States v. Gordon*, 61 F.3d 263, 269 (4th Cir. 1995)) (other citations omitted).

We have cautioned in fraud cases in particular — where every defendant will have gained the confidence and trust of the victim — that fraud alone cannot justify the § 3B1.3 enhancement. *Caplinger*, 339 F.3d at 236-37 (citing *United States v. Bollin*, 264 F.3d 391, 415 (4th Cir. 2001)). Instead, the term "position of public or private trust" in § 3B1.3 "is a term of art, appropriating some of the aspects of the legal concept of a trustee or fiduciary." *Id.* at 237 (internal quotation marks omitted); *see also* USSG § 3B1.3, comment. (n.1) (2002) (explaining that enhancement applies, for example, "in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination"). "In other words, application of the enhancement requires more than a mere showing that the victim had confidence in the defendant. Something more akin to a fiduciary function is required." *Caplinger*, 339 F.3d at 237 (internal quotation marks omitted).

Here, the court accepted as true the facts set forth in the PSR. However, those facts do not support the imposition of the § 3B1.3 enhancement. That is, the PSR states that representatives of the victimized federal agencies, in awarding contracts to Detector Dogs, relied on Ebersole's assertions that he was certified by state and federal regulating agencies as a bomb-sniffing canine team handler. Accordingly, the PSR describes an "'arms-length commercial relationship[ ] where trust is created by the defendant's personality or the victim's credulity,'" which cannot justify the § 3B1.3 enhancement. *Caplinger*, 339 F.3d at 237 (quoting *Bollin*, 264 F.3d at 415). The PSR does not set forth any facts indicating a fiduciary relationship between Ebersole and the federal agencies, as would support the enhancement. *Cf. United States v. Glymph*, 96 F.3d 722, 727-28 (4th Cir. 1996) (affirming application of § 3B1.3 enhancement against government contractor who had held position of trust by virtue of being allowed to self-certify compliance with purchase order requirements). In the present circumstances, the court erred in enhancing Ebersole's sentence for abuse of a position of trust.[19]

---

[19]By contrast, we cannot say that the court misapplied the two-level enhancement for an offense involving conscious or reckless risk of death or serious bodily injury, under *United States Sentencing Guidelines Manual* § 2B1.1(b)(11) (2002). At the outset, we observe that because Ebersole did not object at sentencing to the § 2B1.1(b)(11) enhancement, it is subject to only plain error review. *See United States v. Bros. Constr. Co. of Ohio*, 219 F.3d 300, 320 (4th Cir. 2000). Moreover, we have recognized that the "reckless endangerment" enhancement may apply to perpetrators of offenses involving fraud or deceit under appropriate circumstances. *See, e.g., United States v. Turner*, 102 F.3d 1350, 1359 (4th Cir. 1996) (affirming enhancement where defendants, despite myriad of safety problems experienced over years by their coal company and general danger of underground mining, failed to provide miners with required annual training and falsified relevant records).

As with the enhancement for abuse of a position of trust, the court imposed the reckless endangerment enhancement on recommendation of the PSR, which maintained that "sending ill-prepared dogs and handlers to patrol public buildings for explosive devices created a hazard to [Detector Dogs's] employees, as well as to the employees of the federal agencies affected." Ebersole contends that the enhancement was improper, because there were no injuries or deaths associated with his

IV.

Pursuant to the foregoing, we affirm Ebersole's convictions, vacate his sentence, and remand to the district court for resentencing.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*

MICHAEL, Circuit Judge, concurring in part and dissenting in part:

I agree with most of the majority's opinion and therefore concur in parts II.A, II.B.1, and III. I respectfully dissent, however, from the majority's determination in part II.B.2 that venue was proper in the Eastern District of Virginia for the two false claims counts. *See ante* at 14-22. Because no part of the conduct that would constitute a false claims offense occurred in the Eastern District of Virginia, venue for the two counts was not proper there.

Under the Sixth Amendment a defendant has the right to be tried in the district in which the crime was committed. U.S. Const. amend. VI. "When . . . the statute defining the substantive offense does not indicate where Congress considered the place of committing the crime to be, the [place of the crime] must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Blecker*, 657 F.2d 629, 632 (4th Cir. 1981) (internal quotation marks and citation omitted). In assessing venue, "a court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission

---

conduct, and there was no evidence that any terrorist explosives entered onto the property that the Detector Dogs canine teams were supposed to protect. Ebersole's contention lacks merit, as the § 2B1.1(b)(11) enhancement depends on "risk" of death or serious bodily injury, not actual death or bodily injury. *See Turner*, 102 F.3d at 1359 (recognizing that fact that no mine accidents were directly attributable to lack of training did not render defendants' conduct any less reckless). We agree with the prosecution that, "[g]iven the deadly nature of the threat that Ebersole's EOD dog teams were deployed to counter, it was no error at all for the district court to apply this enhancement." (Appellee's Br. at 54.)

of the criminal acts." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999).

The false claims statute provides that any person who knowingly "makes or presents" a false claim to an "agency or department" of the United States is guilty of a crime. 18 U.S.C. § 287. Moreover, a person who "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." *Id.* § 2(b). The false claims statute thus prohibits not only the direct submission of a false claim to a federal agency but also the submission of a false claim to an agency through the use of an intermediary or agent. *See Blecker*, 657 F.2d at 633-34.

The majority correctly recognizes (1) that the conduct constituting a § 287 offense is the presentation of a false claim to an agency and (2) that the venue issue here turns on whether the false claims were presented to an agency in the Eastern District of Virginia. *See ante* at 18-19. Ebersole submitted one allegedly false claim to the Federal Emergency Management Agency (FEMA) in the Western District of Virginia and a second one to the Department of State in Washington, D.C. These agencies then forwarded the claims for processing to agency branch offices located in the Eastern District of Virginia. No one disputes that venue would have been proper in the district where Ebersole presented the claim to the particular agency, the Western District of Virginia for one and Washington, D.C., for the other. According to the majority, however, the false claims were again presented to the two agencies when the agencies forwarded the claims to their branch offices in the Eastern District of Virginia. The majority thus concludes that the offenses were also committed in the Eastern District of Virginia, making venue proper there as well. I respectfully disagree because the plain meaning of "present" forecloses a conclusion that the claims were again presented to the agencies when the agencies themselves transferred them to branch offices.

The word "present" means to "deliver formally for acceptance." Webster's Third New International Dictionary 1793 (1993). This definition indicates that an item is presented only when a person or entity delivers it to a *different* person or entity. Thus, the conduct constituting the offense of presenting a false claim does not include an agen-

cy's transfer of the claim to one of its branch offices because the branch office is part of the agency itself. Put another way, an agency cannot present, or deliver formally for acceptance, a false claim to itself. For this reason, FEMA's and the Department of State's transfers of Ebersole's claims to branch offices located in the Eastern District of Virginia were not presentations of false claims to the agencies. Accordingly, no conduct constituting the offense occurred in that district.

Our decision in *United States v. Blecker* does not help the majority. In that case we concluded that venue was proper (1) in the district where the defendants delivered the false claims to a private intermediary who, in turn, was to submit them to a government agency located in another district and (2) in the district where the private intermediary submitted the claims to the agency. *Blecker*, 657 F.2d at 632-33. According to the majority, *Blecker* establishes "that Ebersole's false claims could be 'presented' multiple times," and "it is of no significance that the false claims [in *Blecker*] . . . were presented directly to the targeted federal agency just once (by the intermediary), and that Ebersole's false claims were presented directly to the agencies multiple times (as they passed the claims internally in the course of processing them for payment)." *Ante* at 19. *Blecker*, however, is entirely different from Ebersole's case because the defendants in *Blecker* submitted the false claims to a private intermediary. When the private intermediary, in turn, submitted the claims on behalf of the defendants to the government agency, the intermediary's act was part of the conduct constituting the offense, that is, the presentation of false claims *to an agency*. *See* 18 U.S.C. § 287. In contrast, when the agencies in the present case transferred Ebersole's false claims to branch offices, the transfers were not conduct constituting the offense because an agency cannot present a claim to itself. Although Ebersole's presentation of his claims may have triggered a process in which one branch of an agency transferred the claim to another branch, such intra-agency transfer is not criminal conduct covered under the false claims statute.

The majority's decision in part II.B.2 is disquieting because it will allow the government to maneuver venue to its advantage in a false claims prosecution. After today, a defendant who submits a false claim in one district may be tried in any district where the claim

might be routed by the agency during processing and payment. This is at odds with the principle that "the venue provisions of the Constitution are meant to act as safeguards, protecting the defendant from bias, disadvantage, and inconvenience in the adjudication of the charges against him." *Ante* at 8.

The district court submitted the false claims venue question to Ebersole's jury with the following instruction: "it is sufficient for venue purposes if the claim that allegedly was false passed through the Eastern District of Virginia before coming to the final office where it was paid." Record at 1986. This instruction is directly contrary to the simple fact that an agency cannot present a false claim to itself under § 287. I would therefore vacate Ebersole's conviction on the two false claims counts and remand for the dismissal of these counts without prejudice.