UNITED STATES of America,
Plaintiff–Appellee,

v.

John Mark COLLINS, Defendant–
Appellant.

United States of America,
Plaintiff–Appellee,

v.

Robert Marshall Serrano,
Defendant–Appellant.

United States of America,
Plaintiff–Appellant,

v.

John Mark Collins;  Robert Marshall
Serrano, Defendants–Appellees.

Nos. 03–4257, 03–4258, 03–4318.

United States Court of Appeals,
Fourth Circuit.

Argued:  May 7, 2004.

Decided:  June 14, 2004.

**ARGUED**: Sofie Wonderly Hosford, Hosford & Hosford, Wilmington, North Carolina, for John Mark Collins; Kelly Latham Greene, Stubbs & Perdue, P.A., New Bern, North Carolina, for Robert Marshall Serrano. Dennis M. Duffy, Assistant United States Attorney, Office of the United States Attorney, Raleigh, North Carolina, for the United States. **ON BRIEF**: Frank D. Whitney, United States Attorney, Anne M. Hayes, Assistant United States Attorney, Raleigh, North Carolina, for the United States.

Before MOTZ and KING, Circuit Judges, and BOWMAN, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

Affirmed in part and vacated and remanded in part by published opinion. Judge MOTZ wrote the opinion, in which Judge KING and Senior Judge BOWMAN joined.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

A jury convicted John Mark Collins and Robert Marshall Serrano of crimes arising from their participation in sophisticated interstate burglary and money laundering conspiracies. On appeal they challenge their convictions; the Government cross-appeals, asserting that the district court misapplied the Sentencing Guidelines in determining the value of the funds in-volved in their illegal conduct. For the reasons that follow, we affirm the convictions, but vacate the sentences and remand for resentencing consistent with this opinion.

### I.

In July 1996, after working as a law enforcement officer with the Palm Beach County Sheriff's Department for more than a dozen years, Collins resigned and joined a burglary ring operated by his good friend (and former paid informant) William Anthony Granims, and Granims' friend, Michael Ornelas. From July 1996 to July 1999, this team committed ten to fifteen burglaries of jewelry and grocery stores throughout the southeastern United States.

The burglary ring sought to convert the stolen jewelry into cash as quickly as possible. Crucial to accomplishing this goal were three fences in Florida, who provided the team with cash and checks in exchange for the jewelry. By February 1999, Serrano had earned the privilege of becoming the team's primary fence; in return for advancing cash to fund the burglary trips, the group guaranteed Serrano a "first look" at the jewelry. The team would sell Serrano jewelry at prices much lower than retail price. Serrano touted his skill in filing down identifying serial numbers on watches, and agreed to sell those watches that still had serial numbers only in Europe. Testimony from Granims and Ornelas, as well as subsequent taped conversations between Ornelas and Serrano, indicated that Serrano would ask Granims during jewelry purchases if he could "put [the jewelry] in the showcase" and that Granims "knew what [he] meant": namely, was "it stolen locally?"

Most of the crimes for which Collins and Serrano were eventually charged stemmed from burglaries that occurred in North

Carolina. On May 21, 1999, the burglary team, with Collins' participation, stole $220,000 worth of jewelry from a jewelry store in Cary, North Carolina. Immediately after that burglary, the team broke into a grocery store in Durham and stole $31,212 in cash and checks. Within days, they transported the jewelry to Florida and sold it to Serrano for $30,000 ($20,000 in cash and two $5,000 checks). A portion of the proceeds was funneled to Collins in the form of payments on Collins and Granims' jointly-held American Express card.

In June 1999, the team (with Collins in tow) returned to Raleigh, North Carolina in Granims' airplane. After a botched attempt to burglarize a jewelry store, the team stole $20,904 in cash and $3,000 in postage stamps from a grocery store. The group then stole $14,382 from another grocery store in Apex, North Carolina. Collins once again received his share via a payment on his American Express bill. In July, Ornelas sold the stamps to Serrano.

The Government charged Collins and Serrano ("Defendants") by superseding indictment with conspiracy to commit interstate transportation of stolen property ("ITSP") in violation of 18 U.S.C. §§ 371, 2314 (2000); ITSP in violation of 18 U.S.C. § 2314 (2000); conspiracy to engage in money laundering in violation of 18 U.S.C. § 1956(h) (2000); and money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (2000). Collins was also charged with ITSP for the transport of the cash stolen from the grocery stores in North Carolina. After an eight-day trial, a jury convicted Defendants on all counts.

In sentencing Defendants, the district court grouped their offenses, but did not aggregate the amounts associated with the grouped offenses. Instead, the court sentenced Defendants based only on the amounts it attributed to their money laundering offenses. This resulted in a sentencing range of 70 to 87 months for Col-

lins (rather than 108 to 135 months), and 63 to 78 months for Serrano (rather than 97 to 121 months). The court then sentenced Collins to 71 months imprisonment, and Serrano to 64 months imprisonment.

## II.

Defendants challenge their convictions on numerous grounds. Only one requires extended discussion; we turn first to it and then briefly address Defendants' remaining arguments.

## A.

Initially, Defendants maintain that the Eastern District of North Carolina did not provide a proper place of venue for the money laundering charges.

The Constitution provides that "[t]rial of all Crimes ... shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3; *see also id.* amend. VI. In *United States v. Cabrales*, 524 U.S. 1, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998), the Supreme Court recently considered the proper venue for money laundering offenses. The Court ruled that even if the money at issue was derived from illegal narcotics activity in Missouri, that state did not constitute a place of proper venue for money laundering offenses begun, conducted, and completed in another state. *Id.* at 7–10, 118 S.Ct. 1772. However, the *Cabrales* Court did not decide whether a launderer who "acquired the funds in one district and transported them into another" in order to launder them in the latter district, could be tried in the district from which he transported the proceeds. *Id.* at 8, 118 S.Ct. 1772. In *United States v. Stewart*, 256 F.3d 231, 239, 243 (4th Cir.2001), we interpreted the *Cabrales* Court's reservation of this point as delineating an "exception to its rule that money laundering typically does not constitute a continuing offense, triable

both in the district court where the illegal funds were generated and the district in which the financial transaction took place."[1]

The Government relies on this transport exception in asserting that venue was proper in this case. In contrast, Defendants maintain that the actual acts of money laundering in this case—i.e., the actual sales of jewelry—"began and were completed all" in Florida and hence that venue for those charges was only proper in Florida under *Cabrales*. Brief of Appellant at 30.

■■■ Defendants, however, did not raise any objection to venue until the close of evidence in this case. As a result, a question arises as to whether they have waived their objections to venue. We note that "[b]ecause proper venue is a constitutional right, waivers of venue rights through failure to object should not readily be inferred." *Stewart*, 256 F.3d at 238. Accordingly, if an indictment properly alleges venue, but the proof at trial fails to support the venue allegation, an objection to venue can be raised at the close of the evidence. *United States v. Melia*, 741 F.2d 70, 71 (4th Cir.1984) (per curiam). Indeed, a defendant does not waive venue unless the "indictment clearly reveals [the venue] defect but the defendant fails to object." *United States v. Sandini*, 803 F.2d 123, 127 (3d Cir.1986) (internal quotation marks and citation omitted). When, however, the asserted venue defect "is apparent on the face of the indictment" a defendant does waive any objection if he fails to object prior to trial. *Melia*, 741 F.2d at 71 ("The rule that the objection must be made before trial applies ... when the defect is apparent on the face of the indictment.").

■ In this case, the indictment specifically alleges on the basis of the facts set forth above—the burglaries in North Carolina and the transportation of the stolen property to Florida for sale there—that the money laundering offenses took place in the Eastern District of North Carolina. In other words, every fact giving rise to Defendants' present objection to venue clearly appeared on the face of the indictment. Thus, if the facts alleged in the indictment failed to allege a proper basis for venue on the money laundering charges, as Defendants now contend, "the defect [wa]s apparent on the face of the indictment." *Melia*, 741 F.2d at 71. Consequently, by failing to object to venue prior to trial, Defendants have waived their present claims of improper venue. *Id.*

### B.

Defendants also challenge the sufficiency of the evidence, certain rulings of the district court, and two jury instructions. All of these claims are meritless.

■ Contrary to Defendants' contentions, the Government produced evidence sufficient to show that Serrano had knowledge that he purchased stolen jewelry and knowingly participated in the theft and money laundering conspiracies. The steeply discounted price Serrano paid for the stolen jewelry, his prowess in filing down serial numbers, and his incriminating taped admissions provide a wealth of such evidence. Similarly, the Government introduced ample evidence that Collins concealed the proceeds of the burglaries in violation of § 1956(a)(1)(B)(i), including evidence demonstrating that Collins knew the jewelry was being fenced and converted into difficult-to-trace cash and that he

---

1. Under 18 U.S.C. § 3237(a) (2000), offenses "begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."

indirectly received his share of the robbery proceeds via credit card payments.

■■ Defendants' objections to the district court's pretrial and trial rulings are equally unavailing. One of these objections concerns the tapes, referred to above, of conversations between Ornelas and Serrano, which Ornelas made on March 29 and April 2 at the Government's request. The tapes contain many admissions by Serrano relevant to the charged conspiracies, · including Serrano's admissions that he asked Granims during the jewelry purchases if he could "put it in the showcase" (and that Granims "knew what [he] meant"), and that he had been unhappy with the job Ornelas did grinding down a serial number on a watch. These and many other statements were clearly relevant, and, as admissions, not hearsay. See Fed.R.Evid. 801(d)(2)(A); United States v. Wills, 346 F.3d 476, 489–90 (4th Cir.2003). Thus, the district court did not err in admitting the taped statements.[2]

■ Furthermore, we also find meritless Serrano's contention that the district court erred in denying a mistrial when a Government agent, testifying as to Serrano's "cooperation," briefly mentioned that Serrano refused to sign law enforcement consent forms because Serrano said "he had previously been in prison" and did not want to be viewed as a "snitch." The district court immediately granted defense counsel's motion to strike the testimony and delivered a prompt curative instruction. Given these curative measures and the brevity of the agent's remark (which the district court found to be inadvertent), the district court did not err in denying a mistrial. United States v. Hayden, 85 F.3d 153, 158 (4th Cir.1996) (noting that absent the purposeful introduction of prejudicial other crimes evidence by the prosecution, "the courts generally have discerned no reversible error where the trial court has acted promptly in sustaining an objection and advising the jury to disregard the testimony") (internal quotation marks and citation omitted).

■ Finally, Defendants complain about two jury instructions. Clearly, in view of the above evidence, the court did not err in providing the jury with a willful blindness instruction—i.e., an instruction that the jury could find Defendants guilty if it found that they "actually knew" the financial transaction involved proceeds from unlawful activity or if they were "willfully blind" to this fact. See United States v. Campbell, 977 F.2d 854, 857–59 (4th Cir.1992) (noting that while "the [money laundering] statute requires actual subjective knowledge ... this requirement is softened somewhat by the doctrine of willful blindness" and reversing judgment of acquittal because the evidence in the case was sufficient to create a question for the jury concerning whether Campbell "deliberately closed her eyes to what would otherwise have been obvious to her") (internal quotation marks and citation omitted).

---

**2.** Prior to trial, Collins moved to sever his case from Serrano's on the ground that the taped Serrano–Ornelas conversations would prejudice him. The tapes do not even mention Collins, and he utterly failed to "establish that actual prejudice would result from a joint trial." United States v. Reavis, 48 F.3d 763, 767 (4th Cir.1995). Collins' challenge to the district court's forty-five minute limit on his closing argument is equally unpersuasive, particularly given that the court allowed Serrano an additional thirty minutes and limited the Government, which had the burden of proof with respect to both defendants, to forty-five minutes. See Herring v. New York, 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (noting that the presiding judge "may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant" and "must have broad discretion" in such matters).

The other challenged instruction defined reasonable doubt. Although we have repeatedly held any instruction on reasonable doubt ill-advised, *see, e.g., United States v. Reives*, 15 F.3d 42, 45–46 (4th Cir.1994), the district court in this case provided a reasonable doubt instruction *at the request* of Defendants. Moreover, the court used the precise language put forth by Collins, except that the court added the word "real" to modify "doubt." Thus, the court instructed that: "[a] reasonable doubt is a *real* doubt, based upon reason and common sense after careful and impartial consideration of all the evidence in the case." (emphasis added). Contrary to Defendants' argument, the addition of the word "real" in this sentence does not substantially change the meaning of the instruction, so as to make it constitutionally deficient. *See United States v. Williams*, 152 F.3d 294, 297–98 (4th Cir. 1998) (finding no reversible error where court instructed jury that a "reasonable doubt is a real doubt based upon reason and common sense"). Moreover, Serrano requested an instruction that included "real" as a modifier of "doubt." Thus, in giving the instruction it did, the court essentially gave Defendants an instruction combining the essential elements of both of their requests. As for error in providing *any* reasonable doubt instruction, "[a] defendant in a criminal case cannot complain of error which he himself has invited." *United States v. Herrera*, 23 F.3d 74, 75 (4th Cir.1994) (quoting *Shields v. United States*, 273 U.S. 583, 586, 47 S.Ct. 478, 71 L.Ed. 787 (1927)).

In sum, we reject all of Defendants' challenges to their convictions.

## III.

On cross-appeal, the Government contends that the district court erred as a matter of law in determining the value of the funds involved in Defendants' illegal conduct.

The district court used the 1998 edition of the United States Sentencing Guidelines to calculate Defendants' sentences. As the probation officer recommended in the presentence investigation reports ("PSRs"), the court grouped Defendants' money laundering and ITSP offenses pursuant to U.S.S.G. § 3D1.2(d) (1998). The court then used the money laundering guideline, U.S.S.G. § 2S1.1 (1998), to determine Defendants' base offense level.[3] Neither Defendants nor the Government object to the grouping or the use of U.S.S.G. § 2S1.1 to establish the base offense level. The Government does argue, however, that once the district court grouped the offenses, it erred in refusing to aggregate the amount of funds involved in the grouped offenses.

The probation officer found in her presentence report that Collins was "accountable for the theft" of stolen property—jewelry, cash, and checks—worth $5,786,709.36. However, the probation officer determined the value of funds involved in Collins' money laundering activi-

---

**3.** Effective November 1, 2001, the Sentencing Commission substantially amended the Guidelines for money laundering. The amendments explicitly provide for grouping of money laundering counts with counts for the underlying offense under U.S.S.G. § 3D1.2(c), *see* U.S.S.G. § 2S1.1, cmt. n. 6 (2003), rather than U.S.S.G. § 3D1.2(d), as this court had previously allowed, *see United States v. Walker*, 112 F.3d 163, 167 (4th Cir. 1997). The amendments also set the base offense level for money laundering at either the offense level for the underlying offense from which the laundered funds were derived or eight plus the number of offense levels from the table in § 2B1.1. *See* U.S.S.G. § 2S1.1(a) (2003). In contrast, the 1998 Guidelines set the base offense level for money laundering at 20 or 23. *See* U.S.S.G. § 2S1.1(a) (1998). No party disputes the use of the 1998 Guidelines for Defendants' sentencing.

ty as the cash received in return for the stolen property, which the officer calculated as only $478,295.09. Similarly, the PSR determined that Serrano was accountable for the theft and receipt of $3,250,195.70 worth of stolen property, but that the value of funds laundered by Serrano totaled only $228,159.00.

The district court adopted these figures. The court then followed the PSR recommendation that it use only the value of funds associated with the money laundering offenses ($478,295 for Collins and $228,159 for Serrano) to determine Defendants' specific offense characteristics under U.S.S.G. § 2S1.1(b)(2) (1998). The Government contends that, even if these figures accurately reflect the value of funds involved in the money laundering counts, the district court erred in refusing to aggregate this amount with the amount attributable to the ITSP counts, after it had grouped the money laundering and ITSP counts.[4] We agree.

The district court based its decision to group the counts on U.S.S.G. § 3D1.2(d) (1998), which provides for grouping "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss ... or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the

offense guideline is written to cover such behavior." When offenses are grouped together pursuant to U.S.S.G. § 3D1.2(d), "the offense level applicable to a Group is the offense level corresponding to the *aggregated quantity*." U.S.S.G. § 3D1.3(b) (emphasis added). The Sentencing Commission's commentary further explains that"[w]hen counts are grouped pursuant to § 3D1.2(d), the offense guideline applicable to the aggregate behavior is used." U.S.S.G. § 3D1.3, cmt. n. 3; *see also id.* (instructing the court to "[d]etermine whether the specific offense characteristics ... apply based upon the combined offense behavior taken as a whole"); U.S.S.G. ch.3, pt. D, introductory cmt. (summarizing a rule in Part D "as follows: If the offense guidelines in Chapter Two base the offense level primarily on the amount of money ... involved (*e.g.*, theft ...) ... add the numerical quantities and apply the pertinent offense guideline, including any specific offense characteristics for the conduct taken as a whole"). Thus, after the court properly grouped offenses pursuant to U.S.S.G. § 3D1.2(d)—and again we note that Defendants make no contention that the district court erred in so grouping the money laundering and ITSP offenses—the amounts involved in the two offenses must be aggregated when determining offense levels.[5]

4. Contrary to Defendants' suggestion, determination of this issue does not call on us to review the district court's factual findings, which we would affirm unless clearly erroneous. *United States v. Caplinger*, 339 F.3d 226, 233 (4th Cir.2003). Rather, the Government raises a legal issue—whether the district court properly interpreted the Sentencing Guidelines—which we review de novo. *Id.*

5. In recommending that the offense level on the grouped counts be tied only to the value of funds attributable to the money laundering counts, the PSR found significant that the ITSP offenses caused loss "to the victims of the burglaries while the money laundering offenses measure a general societal harm."

But whether the counts harm the same victim is relevant only in determining whether grouping is appropriate under U.S.S.G. § 3D1.2(a) and (b). The offenses here were grouped, without objection from Defendants, under § 3D1.2(d). That section provides for grouping (and attendant aggregation of amounts associated with those counts) regardless of whether counts involve different victims. See § 3D1.2, cmt. n. 8 (noting that "[c]ounts involving different victims (or societal harms in the case of 'victimless' crimes) are grouped together ... in subsection ... (d)"; *see also Walker,* 112 F.3d at 167 (upholding the grouping of mail fraud and money laundering counts and the aggregation of the amounts associated with those counts).

Accordingly, the funds involved in the grouped money laundering and ITSP counts should have been aggregated to determine the offense level. However, as the Government stated at oral argument, in the case at hand this does not mean that the amounts attributable respectively to the money laundering and ITSP counts should simply be added together. Rather, since these two amounts involve the same property from different viewpoints—the amount attributable to the ITSP counts being, *inter alia,* the value of the property laundered and the amount attributable to the money laundering counts being the value of funds realized from the laundering of that property—the total amount attributable to the ITSP counts already includes the amount attributable to the money laundering counts. Thus, the "aggregated quantity," U.S.S.G. § 3D1.2(d), used to determine Defendants' offense level should be the value of the stolen property transported interstate for which Collins and Serrano were held accountable—i.e., $5,786,709.36 and $3,250,195.70, respectively. *See United States v. Caplinger,* 339 F.3d 226, 231, 235 (4th Cir.2003) (finding that the district court, after grouping wire fraud and money laundering counts under U.S.S.G. § 3D1.2(d), properly set the value of funds under the money laundering guidelines as the total amount of funds wired, when that amount already included the amounts that formed the basis of the money laundering counts).

For these reasons, we vacate Defendants' sentence and remand the case to the district court for resentencing, in accordance with this opinion.

## IV.

In sum, we affirm the convictions of John Mark Collins and Robert Marshall Serrano, and vacate their sentences and remand for resentencing consistent with this opinion.

*AFFIRMED IN PART AND VACATED AND REMANDED IN PART*