**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 04-4794**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MARSHALL NICHOLSON, SR.,

Defendant - Appellant.

-------------------------

UNITED STATES BANK NATIONAL ASSOCIATION,

Movant.

---

**No. 04-4941**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MARSHALL NICHOLSON, JR., a/k/a King,

Defendant - Appellant.

-------------------------

UNITED STATES BANK NATIONAL ASSOCIATION,

Movant.

---

**No. 04-4980**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ROBERT EDWARD TURNER,

Defendant - Appellant.

---

**No. 05-4004**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

GLADYS PAYNE NICHOLSON, a/k/a Gladys Marie
Nicholson,

Defendant - Appellant.

---

Appeals from the United States District Court for the District of
Maryland, at Greenbelt.  Alexander Williams, Jr., District Judge.
(CR-03-268-AW)

---

Argued:  February 3, 2006        Decided:  April 18, 2006

---

Before WILKINSON, LUTTIG, and MICHAEL, Circuit Judges.

---

2

Affirmed by unpublished per curiam opinion.  Judge Michael wrote an opinion concurring in part and concurring in the judgment.

––––––––––––––––

**ARGUED:** Hughie Duvall Hunt, II, KEMET & HUNT, P.L.L.C., College Park, Maryland, for Appellants.  Chan Park, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.  **ON BRIEF:** Thomas J. Saunders, Baltimore, Maryland, for Appellant Marshall Nicholson, Sr.; Michael S. Blumenthal, Landover, Maryland, C. William Michaels, Baltimore, Maryland, for Appellant Marshall Nicholson, Jr.; Allen H. Orenberg, North Bethesda, Maryland, for Appellant Robert Edward Turner.  Rod J. Rosenstein, United States Attorney, Deborah Johnston, Assistant United States Attorney, Patrick M. Pericak, Special Assistant United States Attorney, Greenbelt, Maryland, for Appellee.

––––––––––––––––

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Defendants in this case appeal their convictions and sentences arising out of a large operation to distribute drugs in Prince George's County, Maryland. We conclude that their claims lack merit, and affirm the judgment on all accounts.

I.

Defendants are Marshall Nicholson, Jr. (Nicholson, Jr.), his father, Marshall Nicholson, Sr. (Nicholson, Sr.), his mother, Gladys Payne Nicholson (Ms. Nicholson), and an associate, Robert Edward Turner. A grand jury indicted defendants on fourteen counts, all of which stemmed from an investigation of a large-scale drug distribution ring in Prince George's County, Maryland. A jury trial was held beginning on February 24, 2004, and it continued over twenty-four days.

The government introduced extensive evidence at trial, and we merely summarize it here. The evidence demonstrated that Nicholson, Jr. had distributed a large amount of drugs since the 1980s, often from the home of his parents at 7533 Allendale Drive, Palmer Park, Maryland (the Palmer Park home). The evidence consisted of, inter alia, witness testimony, statements obtained from wiretaps, and physical evidence recovered in numerous searches. We will review each in turn.

4

Several witnesses testified as to Nicholson, Jr.'s drug-related activities. Kenneth Pickens, for example, regularly obtained a half-ounce to an ounce of crack from Nicholson, Jr. every week beginning in 1997, for about six months to a year. Some of these transactions took place at the Palmer Park home. As late as January 2003, cooperating with law enforcement, Pickens bought 62 grams of crack from Nicholson, Jr. at the Palmer Park home.

Patricia Tucker testified that she purchased 3.5 grams of crack from Nicholson, Jr. about once a week between 1996 and 2000, often at the Palmer Park home. She and Alan Sarvis also testified that they traveled to Los Angeles with Nicholson, Jr. to purchase eight kilograms of powder cocaine in July 2001. Tucker took four kilograms of cocaine in her suitcase, and returned to the Palmer Park home, where the cocaine was unpacked. Sarvis and another individual hid the other four kilograms on their bodies and returned to Maryland on July 29, 2001. Law enforcement officers intercepted them at the Baltimore-Washington International Airport, and they were arrested.

Jermaine Woodbury testified that he obtained 31 grams of crack from Nicholson, Jr. in March or April 2000. He further noted that in March 2001, he had Nicholson, Jr. convert 125 grams of powder cocaine into crack. A few days later, he also arranged a transaction in which Nicholson, Jr. bought six kilograms of cocaine

from another individual.  Woodbury further testified that on July 17, 2002, he purchased 62 grams of crack from Nicholson, Jr.

Stephen Brown testified that he and Nicholson, Jr. often collaborated in buying cocaine.  Brown facilitated a purchase in 1999 in which Nicholson, Jr. obtained a kilogram of cocaine.  Additionally, between September 2002 and June 2003, they bought approximately 25 kilograms of cocaine from a source in California.  Nicholson, Jr. would convert the powder cocaine into crack and they would then sell it.  Finally, Weldon Barnett testified that he often obtained up to a half-kilogram of crack from Nicholson, Jr. at the Palmer Park home beginning in 1998.  Several of these witnesses testified that Nicholson, Sr. and Ms. Nicholson were in the home when they obtained drugs from Nicholson, Jr.

Ernest Cox, a longtime associate of Nicholson, Sr., testified that during a visit with Nicholson, Sr. in March 2003, Nicholson, Sr. asked him if he knew anyone who sold cocaine.  Cox asked how much Nicholson, Sr. needed, and he responded that he would have to ask his son.  Cox later located a potential source, and Nicholson, Sr. stayed in contact with Cox to help his son arrange the purchase of between five and ten kilograms of cocaine.  Nicholson, Jr. eventually traveled to Texas and Mexico to discuss the sale of this cocaine, but the transaction fell through.

In addition to the multiple witnesses who testified, the government also introduced at trial numerous tape-recorded

6

conversations occurring between March and June 2003 that it had obtained through the use of wiretaps. Law enforcement officers had placed wiretaps on various phones, including several cell phones used by Nicholson, Jr. and the phone at the Palmer Park home. These wiretaps revealed that Nicholson, Jr. would call Nicholson, Sr. to discuss who had come by the home and who had left messages for him. According to law enforcement officers, father and son talked in code about drug distribution.

Physical evidence was also recovered as a result of several searches conducted on June 12, 2003, which marked the end of the investigation. After obtaining search warrants, law enforcement officers searched several homes. At the Palmer Park home, officers recovered a handgun, ammunition, and $85,339 in cash. They also searched defendant Turner's residence, and found a handgun hidden in a sofa in the basement. Officers located Nicholson, Jr.'s Dodge pickup truck, and searched and seized it as well. Among other contraband, they found an RF detector, which detects body wires.

Finally, the government presented evidence to show that Ms. Nicholson had engaged in money laundering when she bought a home with her son's money. On September 9, 1999, Ms. Nicholson closed a deal with Raymond Procopio Builders to purchase a home located at 3220 Dunbratton Court, Waldorf, Maryland (the Waldorf home). From the financial records, it appears that the price of the home was about $500,000, and that the down payment was approximately

$23,000. Nicholson, Jr. was present at the closing. He later told associates that he in fact had purchased the home, that he had put down $100,000 on it, and that he had his mother place the home in her name. When the builder was later called to make repairs on the home, he noted that Nicholson, Jr. was the only person present that he knew.

Detective Dennis Hallinger of the Prince George's County Police Department questioned Ms. Nicholson about her son and the Waldorf home during the search of her own home conducted on June 12, 2003. She said that she did not know what Nicholson, Jr. did for a living and that she owned no other property other than the Palmer Park home. She refused to acknowledge that she had placed the Waldorf home in her name, but did indicate she had done so for her daughter-in-law's home. Ms. Nicholson had for several years deducted mortgage interest she allegedly paid on the Waldorf home from her taxable income on her tax returns.

The jury returned its verdict on April 2, 2004. It acquitted defendants on some counts, but convicted each defendant on at least one. Nicholson, Jr. was convicted of numerous counts. First, the jury convicted him of conspiracy to distribute, inter alia, five kilograms of cocaine and fifty grams of crack from 1999 to June 12, 2003, in violation of 21 U.S.C. § 846 (2000). He was also convicted of possessing with intent to distribute five kilograms of cocaine on July 29, 2001, and of possessing with intent to

distribute fifty grams of cocaine base on July 17, 2002 and January 22, 2003, all in violation of 21 U.S.C. § 841. Finally, he was convicted of using a communication facility to further a drug conspiracy, in violation of 21 U.S.C. § 843(b), and of a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (2000). He was sentenced to a mandatory minimum of life imprisonment based on the drug convictions. See 21 U.S.C. § 841(b)(1)(A).

The jury also convicted Nicholson, Sr. of conspiracy to distribute drugs, and of using a communication facility to further that conspiracy. See 21 U.S.C. §§ 843(b), 846. In addition, it convicted him of making available his family home to store and distribute drugs, in violation of 21 U.S.C. § 856(a)(2). He was sentenced to 135 months in prison. The jury convicted Ms. Nicholson of money laundering for her role in the purchase of the Waldorf home, in violation of 18 U.S.C. § 1956(a)(1)(B)(I). The district court sentenced her to twelve months and a day. Finally, the jury convicted Turner of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He was sentenced to 70 months.

## II.

Defendants initially contend that various pieces of evidence should have been suppressed at trial, because they were obtained in

violation of either statutory or constitutional provisions.  We find no merit in these arguments.


A.

Nicholson, Sr. argues that the government failed to satisfy the statutory "exhaustion" requirement for obtaining wiretaps.  See 18 U.S.C. § 2518(1)(c), (3)(c).  "Prior to granting an order authorizing a wiretap, the issuing judge must find, in addition to probable cause, that 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.'"  United States v. Oriakhi, 57 F.3d 1290, 1298 (4th Cir. 1995) (quoting 18 U.S.C. § 2518(3)(c)).  The government's burden in making this showing "is not great," and we owe "considerable deference to the district court's determination that exhaustion has been shown."  Id. (internal quotation marks omitted).

The government's affidavits in support of the wiretaps were drafted in some detail, and satisfied its burden under 18 U.S.C. § 2518.  The affidavits illustrated that law enforcement officers had utilized several traditional methods of investigation prior to requesting the wiretaps.  The officers had, for example, examined telephone records, employed several confidential informants and an undercover officer, and engaged in trash searches and physical surveillance.  Yet through all these investigative techniques, the

10

officers were not able to uncover the full scope of the drug conspiracy. The affidavits detailed the limitations of each investigative technique attempted thus far. As a result, the affiant claimed wiretaps were necessary. The issuing judge agreed, and we affirm.

B.

Nicholson, Sr. also asserts that the search of his Palmer Park home on June 12, 2003 violated the Fourth Amendment, because the search warrant was improperly based on information obtained from unlawful wiretaps. But this argument is foreclosed by our conclusion that the wiretaps were proper. And even disregarding the evidence obtained through wiretaps, the affidavit in support of the search warrant still presented overwhelming evidence that drug distribution was taking place at the home. See United States v. Wright, 991 F.2d 1182, 1186 (4th Cir. 1993) ("The inclusion of tainted evidence does not invalidate a search warrant if enough untainted evidence supports it."). Confidential informants had, for example, repeatedly visited the Palmer Park home to purchase drugs from Nicholson, Jr. There is thus no basis to suppress the evidence gathered from the search.

11

C.

Nicholson, Jr. contends that the contraband recovered from his Dodge pickup -- including the RF detector -- should have been suppressed, because the police did not have a warrant to search the truck. We disagree. A warrant is not required to search an automobile if it "is readily mobile and probable cause exists to believe it contains contraband." United States v. Brookins, 345 F.3d 231, 238 (4th Cir. 2003) (internal quotation marks omitted); see also Maryland v. Dyson, 527 U.S. 465, 466-67 (1999) (per curiam) (noting that there is "no separate exigency requirement"). These conditions are met here. Nicholson, Jr.'s truck was mobile, and officers had repeatedly witnessed him taking the truck to meet with other coconspirators before they seized it. The contraband obtained from the truck was, therefore, properly admitted at trial.

D.

Ms. Nicholson alleges that the statements she made to Detective Hallinger during the search of her Palmer Park home on June 12, 2003 should have been suppressed because she was not given Miranda warnings. Her contention is mistaken. A defendant's Fifth Amendment Miranda right "relates only to custodial interrogation." McNeil v. Wisconsin, 501 U.S. 171, 178 (1991). "A person is 'in custody' for purposes of Miranda either if the person has been arrested or if his freedom of action has been curtailed to a degree

12

associated with arrest." United States v. Sullivan, 138 F.3d 126, 130 (4th Cir. 1998). Whether someone is in custody is an objective determination based on the totality of the circumstances and on "how a reasonable man would have understood the suspect's position at the time." United States v. Parker, 262 F.3d 415, 419 (4th Cir. 2001).

In this case, Ms. Nicholson was not restrained to a degree associated with arrest. Detective Hallinger expressly stated to her that she was not under arrest and that she was not being charged with a crime. She was questioned in her home, and was not handcuffed. Indeed, she was allowed to go outside to smoke a cigarette during the questioning. Based on all these circumstances, we cannot conclude that Ms. Nicholson was in custody when Hallinger spoke with her, and Miranda warnings were thus not required. See Parker, 262 F.3d at 419 (defendant not in custody when she was told she was not under arrest, was questioned in her home, was not handcuffed or otherwise restrained, and was never told she was not free to leave). The district court, therefore, properly admitted her statements.

III.

Ms. Nicholson also alleges that the district court erred in not severing her trial from that of the other defendants. We review a district court's decision to deny a motion to sever for

13

abuse of discretion. United States v. Rivera, 412 F.3d 562, 571 (4th Cir. 2005). "Generally, individuals indicted together should be tried together." Id. (internal quotation marks omitted). To prove a district court abused its discretion, therefore, a defendant must show prejudice resulted from the refusal. See id. A district court's cautionary instruction can help alleviate potential prejudice, see United States v. Johnson, 219 F.3d 349, 357 (4th Cir. 2000), and "[c]onvictions should be sustained if it may be inferred from the verdicts that the jury meticulously sifted the evidence," Rivera, 412 F.3d at 571 (internal quotation marks omitted).

In the instant case, the district court instructed the jury that the case against each defendant must be based on the evidence against that defendant, and that the jury's verdict as to one defendant did not control as to the guilt or innocence of another defendant. It is clear, moreover, that the jury carefully sifted the evidence, as it convicted Ms. Nicholson on one count, but acquitted her on two others on which one or more co-defendants were convicted. It, for example, acquitted her on the count of making available her Palmer Park home for drug distribution, but convicted her husband. We, therefore, find no basis to conclude that the district court abused its discretion here.

IV.

Ms. Nicholson next challenges the district court's jury instructions. We review a district court's decision whether or not to give a jury instruction for abuse of discretion. See United States v. Abbas, 74 F.3d 506, 513 (4th Cir. 1996). We conclude that the district court did not abuse its discretion in its jury instructions.

A.

Ms. Nicholson first suggests that the district court gave an inappropriate "willful blindness" jury instruction regarding the money laundering charge for her involvement in the purchase of the Waldorf home. The district court instructed the jury that:

> You may infer that a defendant acted knowingly from circumstantial evidence or from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him.
> Stated another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of that fact. Willful blindness exists when a defendant whose suspicion has been aroused deliberately fails to make further inquiries. If you find that a defendant had a strong suspicion that someone withheld important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly.

It also instructed the jury, in addition, that a person cannot act knowingly "because of ignorance, mistake, accident or carelessness." As relevant here, to convict Ms. Nicholson of money laundering under 18 U.S.C. § 1956(a)(1)(B)(I), the government had to show that she had knowledge: "(1) that the funds involved in the

15

transaction were the proceeds of illegal activity; and (2) that the transaction was designed to conceal the nature of the proceeds." United States v. Campbell, 977 F.2d 854, 857 (4th Cir. 1992).

Although we have indicated that a willful blindness instruction should be given sparingly, see United States v. Ruhe, 191 F.3d 376, 385 (4th Cir. 1999), we have repeatedly upheld the use of such an instruction. See United States v. Guay, 108 F.3d 545, 551 (4th Cir. 1997); United States v. Withers, 100 F.3d 1142, 1145 (4th Cir. 1996). And we have done so specifically in the money laundering context. See United States v. Collins, 372 F.3d 629, 634 (4th Cir. 2004) (citing Campbell, 977 F.2d at 857-59). The "instruction is appropriate when the defendant asserts a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance." Guay, 108 F.3d at 551 (internal quotation marks omitted). In determining whether the instruction was proper, "we consider the evidence and any reasonable inferences in the light most favorable to the government." United States v. Whittington, 26 F.3d 456, 463 n.6 (4th Cir. 1994).

In this case, Ms. Nicholson's defense to the money laundering charge was that she lacked the requisite knowledge. We find that the evidence was sufficient to support an inference of deliberate ignorance. A large portion of Nicholson, Jr.'s drug transactions, which dated back to the 1980s, took place in Ms. Nicholson's Palmer Park home. Testimony also showed that she was sometimes in the

16

house when individuals came to engage in drug transactions. And law enforcement officers had conducted a search of her Palmer Park home in 1995 pursuant to a valid search warrant in which crack, PCP, marijuana, and a scale all were found. In addition, she told Detective Hallinger that she did not even know whether her son was employed. Yet Nicholson, Jr. was able to make a large payment on the Waldorf home, and had expensive cars and jewelry. Ms. Nicholson also failed to mention the fact that she had signed the papers for the Waldorf home when Detective Hallinger questioned her about it. She withheld this information even though she had benefited from the transaction, which allowed her to deduct the mortgage interest from her taxable income for several years.

Although there may have been some evidence to the contrary, there was sufficient evidence from which the jury could reasonably infer that Ms. Nicholson was, to say the least, deliberately ignorant of the illegal nature of her son's assets. The jury could likewise infer that there would be little reason -- other than to obfuscate the source of the funding -- for her to act as the nominal purchaser of the Waldorf home. Although the seller of the Waldorf home may have been aware that Nicholson, Jr. was behind the purchase, evidence supports the conclusion that Ms. Nicholson's role was to keep this information from government authorities, and that she was deliberately ignorant of this fact.

17

The district court, moreover, gave an instruction that knowledge cannot be based on mistake or accident. This instruction goes a long way to reducing the risk that the jury might find knowledge based only on Ms. Nicholson's negligent failure to discover that drug money was the source of the home purchase. See Withers, 100 F.3d at 1145. For these reasons, the district court did not abuse its discretion in giving the willful blindness instruction.

B.

Ms. Nicholson also contends that the district court improperly failed to advise the jury that good faith was "an absolute defense" to the money laundering charge. Her argument is mistaken. The district court did not have to give this good faith instruction, because it properly informed the jury on the knowledge requirements of the money laundering offense. See United States v. Fowler, 932 F.2d 306, 317 (4th Cir. 1991) (refusing to require separate good faith instruction if instruction on specific intent is adequate).

V.

Ms. Nicholson next asserts that the district court abused its discretion in refusing to grant her a new trial, because the government's evidence at trial was much broader than the money laundering charge in the indictment. Specifically, she contends

18

that the government improperly introduced evidence that she committed mortgage and tax fraud. We cannot agree. It is true that the Fifth Amendment grand jury trial right is violated when a defendant is convicted of an offense that was beyond the charges in an indictment. See United States v. Randall, 171 F.3d 195, 203 (4th Cir. 1999). But in this case the evidence that Ms. Nicholson might have lied on her loan application for the Waldorf home, and that she took mortgage interest deductions in her tax returns from this home was used to prove the knowledge element of the money laundering count, which was clearly charged in the indictment. The district court, therefore, did not abuse its discretion in refusing to grant a new trial.

## VI.

All four defendants further claim that the district court erred in not granting their motions for judgment of acquittal, because their convictions were not supported by sufficient evidence. "A defendant challenging the sufficiency of the evidence to support a conviction must overcome a heavy burden." United States v. Hamlin, 319 F.3d 666, 672 (4th Cir. 2003) (internal quotation marks omitted). "[V]iewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government," we must sustain the conviction if "the evidence adduced at trial could support any rational

19

determination of guilty beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 863 (4th Cir. 1996) (en banc) (internal quotation marks omitted). We have reviewed each of the defendants' claims with care, and find there to be sufficient evidence to support all the convictions.

VII.

Lastly, Nicholson, Jr. claims that sentencing him under the mandatory Sentencing Guidelines violated United States v. Booker, 125 S. Ct. 738 (2005). His argument is misplaced, because his life term was based not on the Guidelines but instead on a statutory mandatory minimum. See 21 U.S.C. § 841(b)(1)(A). "Booker did nothing to alter the rule that judges cannot depart below a statutorily provided minimum sentence." United States v. Robinson, 404 F.3d 850, 862 (4th Cir. 2005). While one of the prerequisites for the mandatory minimum was a finding that Nicholson, Jr. had committed two prior drug felonies, Booker does not preclude proper judicial determination of prior convictions. See United States v. Cheek, 415 F.3d 349, 352-53 (4th Cir. 2005). The district court thus did not err in applying the mandatory minimum sentence in § 841(b)(1)(A).

20

## VIII.

For the foregoing reasons, the convictions and sentences of all defendants are

<u>AFFIRMED</u>.

MICHAEL, Circuit Judge, concurring in part and concurring in the judgment:

Spending money is legal.  Laundering money by concealing is not.  The line between these two categories of commercial transactions is sometimes blurry.  That line can become even blurrier in a money laundering prosecution when the government obtains the (rarely used) willful blindness instruction.  A jury following the instruction may infer from circumstantial evidence the defendant's deliberate ignorance of the transaction's criminal aspect, which in turn allows the jury to infer guilty knowledge. The potentially slippery combination of the willful blindness instruction and a concealment money laundering charge cannot be permitted to eviscerate the defendant's right to be convicted only upon proof beyond a reasonable doubt.  Thus, when the government considers requesting a willful blindness instruction, it (and the district court if the request is made) must be especially careful in examining  the evidence that might support such an instruction.

While I believe that the government fell demonstrably short here in its duty to examine, I ultimately conclude that the record provided the bare minimum for allowing the willful blindness instruction in the concealment money laundering prosecution of Gladys Payne Nicholson.  I emphasize, however, that the evidence supporting the instruction was far weaker than the government would have us believe.  For these reasons, I am unable to join part IV.A

22

of the court's opinion, although I concur in the judgment as to that part. I otherwise concur.

I.

According to the trial evidence, defendant Ms. Nicholson resided at a modest home in Palmer Park, Maryland, with her husband, defendant Marshall Nicholson Sr. Their son, defendant Marshall Nicholson Jr., often engaged in drug sales at the family home, and Nicholson Sr. facilitated or even conducted some of these sales. In 1995 Ms. Nicholson posted bond for her son after he was arrested on state drug charges; the authorities later recovered receipts from that bond transaction in a search of the home. Ms. Nicholson was never a party to any drug sales, and there was no evidence that she ever witnessed such sales.

The concealment money laundering count against Ms. Nicholson stems from her role in the purchase of a house at 3220 Dunbratton Court in Waldorf, Maryland. Nicholson Jr. eventually lived in the house. The transaction closed on September 9, 1999. Although the house had a price tag of $500,000 as reported on the mortgage documents, the seller, Raymond F. Procopio Builders, Inc., actually accepted a lower price. At closing Ms. Nicholson paid $23,669. A lender, Equicredit Corporation of Maryland, paid $340,726, and it was Ms. Nicholson who borrowed this money from Equicredit by signing appropriate loan documents. The builder

23

retained a deposit of $25,000. It appears that the cash sum of $7,905 was used at the closing. The origin of this cash is not clear; the seller's representative, Raymond F. Procopio, testified that no cash changed hands at closing. Nicholson Jr. later told an associate that he put down $100,000 toward the purchase of the house.

Ms. Nicholson, who worked for the U.S. Department of Health and Human Services, earned as much as $62,000 a year in wages until her retirement in 2000; thereafter her income was about $45,000 a year. (Nicholson Sr., who was wheelchair bound, had negligible income other than social security.) Ms. Nicholson's ordinary income after taxes was thus not enough to pay the monthly mortgage installments on the Dunbratton Court house. Nicholson Jr. must have paid the mortgage, but his <u>only</u> apparent source of legitimate income was a car washing and detailing service that he operated.

On June 12, 2003, while law enforcement executed a search warrant at the family home, Prince George's County Police Detective Dennis Hallinger asked Ms. Nicholson several questions about her ownership of property. Asked whether she had her name on any property other than her home, Ms. Nicholson indicated that she was record owner of the house in which her daughter-in-law Cheryl Nicholson resided, but that Cheryl paid the mortgage on that house. Hallinger testified that he then asked Ms. Nicholson, "Do you own

24

any other property that you just put in your name for someone else like you did for Cheryl?." She said she did not.

## II.

### A.

Count Twelve of the indictment (the sole count upon which the jury convicted Ms. Nicholson) charged that Ms. Nicholson violated the concealment money laundering statute, 18 U.S.C. § 1956(a)(1)(B)(I), when she bought the Dunbratton Court house. To obtain a conviction under § 1956(a)(1)(B)(I) the government must prove that

> (1) the defendant conducted or attempted to conduct a financial transaction having at least a de minimis effect on interstate commerce . . .; (2) the property that was the subject of the transaction involved the proceeds of specified unlawful activity; (3) the defendant knew that the property involved represented the proceeds of some form of unlawful activity; and (4) the defendant knew that the transaction was designed in whole or part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activity.

United States v. Wilkinson, 137 F.3d 214, 221 (4th Cir. 1998) (citation omitted). The first two elements are undisputed here but the second two are; each disputed element requires a knowing mindset. The elements thus require that Ms. Nicholson knew (1) that buying the house involved proceeds from Nicholson Jr.'s drug distribution, and (2) that buying the house was a transaction that

25

at least partially was designed to conceal or disguise those proceeds.

"[W]hen the defendant asserts a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance," the court may instruct the jury on willful blindness. United States v. Ruhe, 191 F.3d 376, 384 (4th Cir. 1999). The instruction allows the defendant's deliberate ignorance of a fact to be treated as knowledge of that fact, and the government may establish deliberate ignorance by offering circumstantial evidence. "The record need not contain direct evidence . . . that the defendant deliberately avoided knowledge of wrongdoing; all that is necessary is evidence from which the jury could infer deliberate avoidance of knowledge." United States v. Whittington, 26 F.3d 456, 463 (4th Cir. 1994). In evaluating the propriety of the willful blindness instruction, "we consider the evidence and any reasonable inferences in the light most favorable to the government." Id. at 463 n.6.

We have cautioned district courts, however, that "the deliberate blindness instruction is only proper in rare circumstances." Ruhe, 191 F.3d at 385. And although the majority correctly notes, ante at [16], that we have allowed juries in money laundering cases to receive the willful blindness instruction, United States v. Collins, 372 F.3d 629, 634 (4th Cir. 2004), United States v. Campbell, 977 F.2d 854, 858-59 (4th Cir. 1992), careful

26

examination shows that those cases are not easily squared with this one.

B.

In Collins one of the defendants helped finance burglaries and regularly served as a "fence" who bought stolen goods with cash and checks; the other assisted with the burglaries and received part of his share of the ill-gotten gains through seemingly legitimate payments on his credit card debt. Collins, 372 F.3d at 631-32. The defendants thus played important, direct roles in the illegal activity that generated the profits they then helped to conceal. By contrast Ms. Nicholson was neither a direct participant in nor a direct observer of any drug sale. She also did not derive any direct profit from any such sale.

The defendant in Campbell was a licensed realtor who, after spending a good deal of time with the buyer (a drug dealer), relayed to the sellers the buyer's proposal to pay $60,000 in cash under the table and lower the contract price accordingly. Campbell, 977 F.2d at 855-56. By contrast Ms. Nicholson, a long-time federal government employee, was not in the business of buying and selling real estate. As a result, although the government stressed that there were numerous irregularities in the documents Ms. Nicholson signed when she bought the Dunbratton Court house, and that the reported sales price of the house exceeded the price

27

actually paid, this evidence is of little force.  Ms. Nicholson, who was not a realtor by trade, may well have been unaware of the significance of these irregularities.  In addition, while Campbell involved a huge cash payment that should have by itself been a red flag for the realtor that something was amiss, less than $8,000 in cash was tendered at the closing in which Ms. Nicholson participated.  This amount was not so large that it should have aroused Ms. Nicholson's suspicions as to the source of that cash.

Finally, the defendant in Campbell did not challenge the propriety of the willful blindness instruction.  See Campbell, 977 F.2d at 857 ("Neither party disputes the adequacy of these instructions on willful blindness or their applicability to this case.") (emphasis added).  That obviously limits Campbell's value as a precedent because Ms. Nicholson disputes the use of the instruction in her case.

III.

Other circuits have recognized that fact-intensive inquiry is particularly important in concealment money laundering cases, such as this one, which are quite different from the traditional example of money laundering.  "In [money laundering's] classic form, the money launderer folds ill-gotten funds into the receipts of a legitimate business, such as a restaurant or a concert ticket service (two common destinations).  The variations,

28

however, are endless, and it can be difficult to categorize transactions that deviate from the paradigm." United States v. Esterman, 324 F.3d 565, 570 (7th Cir. 2003). It is essential for us, "even if difficult at times, to ensure that the money laundering statute not turn into a 'money spending statute.'" Id. at 573 (quoting United States v. Sanders, 929 F.2d 1466, 1472 (10th Cir. 1991). Where, as here, the willful blindness instruction is applied to the concealment money laundering statute's requirement that there be knowledge with respect to two distinct elements of the crime, our evaluation of the asserted basis for the instruction must be especially thorough and exacting.

A.

This evaluation reveals that a good deal of evidence the government points to as supporting the money laundering count is less pertinent to the critical mental state issues than the government asserts. I begin with the evidence concerning drug deals that occurred years after Ms. Nicholson bought the Dunbratton Court house. This evidence is of negligible value in drawing inferences about Ms. Nicholson's awareness of any illegal activity by Nicholson Jr. before she bought the house. For example, the government emphasizes the conversation recorded in January 2003 between witness Kenneth Pickens and Nicholson Jr. at Ms. Nicholson's home. Ms. Nicholson was present in the room when

29

Pickens and Nicholson Jr. were talking; the conversation led to a drug deal that day between the men. Nevertheless, this evidence has little logical relevance to Ms. Nicholson's knowledge of her son's drug dealing when she bought the Dunbratton Court house in 1999, because a criminal conviction requires a defendant to have the requisite guilty mind at the same instant the defendant is performing the bad act prohibited by statute. "[I]t is a basic premise of Anglo-American criminal law that the physical conduct and the state of mind must concur." United States v. McDougald, 990 F.2d 259, 263 (6th Cir. 1993) (quoting W. Lafave & A. Scott, Criminal Law § 3.11, at 268 (2d ed. 1986)). Even if Ms. Nicholson realized in January 2003 that Nicholson Jr. was selling drugs and that he arranged to have her buy the house in her name to conceal his drug profits by making mortgage payments with them, she would not have been guilty of concealment money laundering because she would not have possessed the required mindset when she bought the house in September 1999.

In addition, witness testimony that Nicholson Jr. sold drugs out of the parental home "since the early 1980s," Appellee's Br. at 52, does nothing to establish Ms. Nicholson's deliberate ignorance of those drug sales absent some other evidence that Ms. Nicholson could have perceived the transactions as they were taking place. Since she worked during the day, she simply may not have been home when the drug sales occurred. That her husband and son

30

were drug dealers and that she lived in proximity to them cannot be enough to rationally impute knowledge of the dealing or even deliberate ignorance of the dealing to her. "[M]ere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement." McDougald, 990 F.2d at 262 (quoting United States v. Nusraty, 867 F.2d 759, 764 (2d Cir. 1989)).

Finally, the government exaggerates the import of Ms. Nicholson's answers to Detective Hallinger's questions on June 12, 2003. Ms. Nicholson never told the detective, for example, that the house was held in Nicholson Jr.'s name rather than her name, or that she paid the mortgage even though Nicholson Jr. apparently did. We distinguish such affirmative exculpatory misrepresentations from denials of guilt. "While general denials of guilt later contradicted are not considered exculpatory statements, any other exculpatory statement which is contradicted by evidence at trial" permits the jury to infer consciousness of guilt from the demonstrably false alibi. United States v. McDougald, 650 F.2d 532, 533 (4th Cir. 1981) (per curiam). Ms. Nicholson's answers are properly classified as denials of guilt, not as false exculpatory statements. In addition, since the government's theory of the concealment money laundering count is essentially that Nicholson Jr. used Ms. Nicholson as a straw buyer for the house, Ms. Nicholson would only have advanced the transaction's concealment purpose by holding herself out as the

31

true owner of the house. By tending to deny such ownership, Ms. Nicholson reduced her effectiveness as a straw buyer. Thus, Ms. Nicholson's responses to the detective do not rationally support the government's theory.

B.

I now turn to the evidence that rationally supports an inference that Ms. Nicholson deliberately ignored (1) the source of the money Nicholson Jr. contributed to the house purchase, and (2) the design of the purchase as a concealing transaction. As to the first element, Ms. Nicholson posted bond for her son when state police arrested him on drug charges in 1995. The jury could logically conclude that she knew of his drug dealing in 1995, and that when participating in the house deal in 1999 she deliberately ignored the illegal source of her son's money (which he needed to pay off the $340,726 loan taken out to pay for the house).

As to the second element, the government's evidence established a significant discrepancy between Ms. Nicholson's annual income as reported on her tax return in 1998 (in particular, $58,238 in wages plus $3,065 deferred into her retirement fund) on the one hand, and the amount of money ($340,726) borrowed from Equicredit to buy the house in 1999 on the other hand. The jury was entitled to conclude from this discrepancy (and from the bond posting in 1995) that Ms. Nicholson knew in 1999 that she could not

32

have afforded to buy the house herself and that her son could not have afforded the house either -- unless he paid with illicit funds that he wanted to conceal.

The only legal income Nicholson Jr. had was from a car detailing business, and the jury could have relied on common sense in concluding that the business simply would not have generated the amount of money Nicholson Jr. needed each month to pay off the mortgage. Conversely, if the discrepancy between any legitimate income source and the value of the house had been very small, it would have been far more likely that Ms. Nicholson was simply negligent -- but not deliberately ignorant -- of the transaction's concealment aspect. The bond posting and the income-mortgage discrepancy are not strong pieces of evidence, but we must view them in the light most favorable to the government. Whittington, 26 F.3d at 463 n.6. In that light there was enough evidence that Ms. Nicholson was deliberately ignorant to allow the jury to receive the willful blindness instruction. Accordingly, the majority is correct in denying Ms. Nicholson a new trial and affirming her conviction.


IV.

This case is unusual in that it involves a concealment money laundering prosecution not of Nicholson Jr., the principal, but of Ms. Nicholson, the third party nominee in the Dunbratton

33

Court house purchase.  The willful blindness instruction allowed the jury to infer her guilty knowledge as to two distinct elements of the concealment money laundering statute.  The basis for the instruction was ultimately adequate, but I have explained why it was not nearly as substantial as the government's brief indicates. I trust that the government will take care in the future to make a thorough and exacting inquiry before it requests a willful blindness instruction in any case, especially a money laundering case.  Any failure to do that would disrespect our warning that the instruction "is only proper in rare circumstances."  Ruhe, 191 F.3d at 385.